MAX FREUDMANN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HENRI FREUDMANN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 9100, 9101. Promulgated May 10, 1948.

*Bernard Weiss, Esq.*, for the petitioners.
*Henry C. Clark, Esq.*, for the respondent.

779

788

## OPINION.

BLACK, *Judge*: The four issues previously summarized will be considered in their regular order.

*Issue 1.*—This issue is described in our opening statement and in footnote 1 of our findings of fact. The material provisions of the Internal Revenue Code are in the margin.[3]

---

[3] SEC. 22. GROSS INCOME.

(a) GENERAL DEFINITION.—"Gross income" includes gains, profits, and income derived from * * * trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *

* * * * * * *

(c) INVENTORIES.—Whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

Section 19.22 (a)–5 of Regulations 103 provides that "In the case of a manufacturing, merchandising, or mining business, 'gross income' means the total sales, less the cost of goods sold  *   *   *."

During the fiscal year ended March 31, 1941, the New York partnership sold both polished and rough diamonds. It reported a gross profit of $49,201.55 on the polished diamonds and a gross profit of $19,307.35 on the rough diamonds. The respondent determined that the gross profit on the rough diamonds, instead of $19,307.35, was $114,282.03, which is an arbitrary 35 per cent of the net sales of rough diamonds of $326,520.09. In arriving at this gross profit of $114,-282.03 the respondent determined that the cost of the rough diamonds sold was $212,238.06, which is an arbitrary 65 per cent of the net sales of rough diamonds. This issue involves only the determination of the proper cost of the rough diamonds sold during the fiscal year ended March 31, 1941, and is purely a question of fact. The partnership determined that this cost was $307,212.74. As above stated, the respondent determined it to be $212,238.06. Petitioners now contend it was $365,817.46. We have found as an ultimate fact that the cost of the rough diamonds sold was $325,218.16, which is $40,599.30 ($39,-979.76 plus $619.54) less than the amount contended for by petitioners. The details of this ultimate determination are set out in our findings of fact relating to this issue.

The entire controversy on this issue is narrowed down to whether the petitioners have sufficiently proved the cost of the diamonds brought over to the United States from Belgium by Felix. The respondent contends that petitioners have failed in their proof, whereas petitioners contend that they have proved this cost to be $306,757.88, determined as follows:

| | |
|---|---:|
| Cost as per the translated list | $292,801.09 |
| Less diamonds belonging to Felix | 7,350.96 |
| Balance of cost per the translated list | 285,450.13 |
| Add amount paid to Cerqueira | 21,307.75 |
| Cost of diamonds brought from Belgium | 306,757.88 |

We agree with petitioners' contention, except that we do not think petitioners have sufficiently proved that the adjustment which they made on the books of the partnership at the close of the fiscal year, whereby the cost of the diamonds brought over from Belgium as set up on the books of the partnership was adjusted downward by the amount of $39,979.76, was improper, and except that we think the amount paid to Cerqueira must be reduced by $619.54, the amount allocable to the diamonds belonging to Felix.

The respondent offered no evidence in explanation of how he arrived at the arbitrary determination that 65 per cent of the gross sales equaled the cost of the rough diamonds sold. The basis for his determination was, of course, that, in his opinion, petitioners had not established the cost of the diamonds brought over to the United States from Belgium. But petitioners had gross sales of rough diamonds other than those brought over from Belgium in an amount in excess of $185,745.06 ($110,095.98 minus $78,898.10 plus $154,547.18) and the respondent's 65 per cent rule applied to these other rough diamonds as well as those brought over from Belgium, although the partnership maintained complete records as to these other rough diamonds.

We, therefore, hold for reasons already stated that petitioners have sufficiently proved the cost of the diamonds brought over to the United States from Belgium to be $245,470.37, exclusive of the amount paid to Cerqueira which we shall now consider.

The respondent contends that no part of the $21,307.75 paid to Cerqueira is deductible as a part of the cost of the diamonds brought over to the United States from Belgium on the ground that, as stated in his brief, "The payments to him were for his political influence and ability in this regard and come within the decisions of" *Kelley-Dempsey & Co.*, 31 B. T. A. 351; *Easton Tractor & Equipment Co.*, 35 B. T. A. 189; *New Orleans Tractor Co.*, 35 B. T. A. 218; and *T. G. Nicholson*, 38 B. T. A. 190. There is no basis for the respondent's assumptions that the amount paid to Cerqueira was paid for political influence and was of such a nature as to be against public policy. Petitioners employed Cerqueira because he was considered the best man to accomplish the task of transporting the diamonds from France to Portugal. The cases relied upon by the respondent are not in point. We hold that the amount paid to Cerqueira represented a part of the cost of the diamonds that were transported. Since $7,350.96 worth of the diamonds transported belonged to Felix and $245,470.37 belonged to petitioners, we hold that 7,350.96/252,821.33 ($245,470.37 plus $7,350.96) of the $21,-307.75 or $619.54 should be considered a part of the cost of the diamonds belonging to Felix and the balance of $20,688.21 should be considered a part of the cost of the diamonds belonging to petitioners.

For the reasons heretofore given we hold that the cost of all of the rough diamonds sold by the New York partnership during the fiscal year ended March 31, 1941, was the amount of $325,218.16, the details of which appear in our findings of fact.

*Issue 2.*—This issue is whether petitioners are entitled to compute their tax liabilities upon the basis of fiscal years ended March 31, 1940 and 1941, as petitioners contend, or whether they must compute their

tax liabilities upon the basis of calendar years ended December 31, 1940 and 1941, as the respondent has determined. The parties have stipulated what adjustments are to be made "If the Court finds that the petitioners' taxable years are the fiscal years" and what adjustments are to be made "If the Court finds that the petitioners' taxable years are the calendar years  *  *  *." Our sole problem is to determine whether petitioners' taxable years are the fiscal or the calendar years. The material provisions of the Internal Revenue Code and Regulations 103 are set forth in the margin.[4]

Section 41 deals with accounting periods and methods of accounting. We are not here concerned with the methods, but are concerned only with whether petitioners have proved that during the periods here in question they kept books on a fiscal year annual accounting period ending March 31. If the evidence shows that during the periods here in question petitioners kept books on a fiscal year annual accounting period ending March 31, then under the plain language of section 41 "The net income shall be computed" upon that basis. The respondent contends that during the periods here in question petitioners had no annual accounting period and did not keep books and that, therefore, under section 41 "the net income shall be computed on the basis of the calendar year."

---

[4] SEC. 41. GENERAL RULE.

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 48 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year.

SEC. 46. CHANGE OF ACCOUNTING PERIOD.

If a taxpayer changes his accounting period from fiscal year to calendar year, from calendar year to fiscal year, or from one fiscal year to another, the net income shall, with the approval of the Commissioner, be computed on the basis of such new accounting period, subject to the provisions of section 47.

SEC. 48. DEFINITIONS.

When used in this chapter—

(a) Taxable Year.—"Taxable year" means the calendar year, or the fiscal year ending during such calendar year, upon the basis of which the net income is computed under this Part.  *  *  *

(b) Fiscal Year.—"Fiscal year" means an accounting period of twelve months ending on the last day of any month other than December.

Sec. 19.41–4. [Regulations 103.] Accounting Period.—The return of a taxpayer is made and his income computed for his taxable year, which in general means his fiscal year, or the calendar year if he has not established a fiscal year. (See section 48.) The term "fiscal year" means an accounting period of 12 months ending on the last day of any month other than December. No fiscal year will, however, be recognized unless before its close it was definitely established as an accounting period by the taxpayer and the books of such taxpayer were kept in accordance therewith. A person having no such fiscal year must make his return on the basis of the calendar year. Except in the case of a first return for income tax a taxpayer shall make his return on the basis upon which he made his return for the taxable year immediately preceding, unless, with the approval of the Commissioner, he has changed his accounting period.  *  *  *

Prior to 1940 petitioners were nonresident aliens. As such, they were subject to the United States income tax only if they had income from sources within the United States. They had no such income until the New York partnership was formed on April 1, 1939. The partnership established a fiscal year annual accounting period ending on March 31, and the respondent concedes that the net income of the partnership must be computed upon that basis. The books of the partnership, however, are not for income tax purposes the books of the individual taxpayers making up the partnership. *Fred R. Drake*, 1 B. T. A. 1235; *Max H. Stryker*, 36 B. T. A. 326. Prior to April 1, 1939, petitioners, being nonresident aliens and not having any income from sources within the United States, were not required to file any United States income tax returns. After the New York partnership was organized on April 1, 1939, petitioners had an election as to whether they would file their first individual nonresident alien income tax returns on the calendar year basis or on the basis of some "fiscal year" as defined in section 48 (b) of the code, provided that if they elected the latter it would be necessary for them, prior to the close of the first fiscal year, to comply definitely with section 41 of the code and section 19.41–4 of Regulations 103. Cf. O. D. 404, 2 C. B. 67, and *Estate of Cyrus H. K. Curtis*, 36 B. T. A. 899, 906.

Petitioners elected to file their individual income tax returns on the same fiscal year basis as that used by the New York partnership and, as the evidence shows, they did file them on that basis. Petitioners had a right to make this election, provided they fully complied with the code and the regulations thereunder. Under section 41 of the code and section 19.41–4 of Regulations 103 it was necessary for petitioners, before the close of any such elected fiscal year, definitely to establish such an annual accounting period by means of books kept upon such a basis. We are unable to find from the evidence that petitioners, as individuals, kept books, either in Belgium or in the United States, on an annual accounting period of twelve months ending on March 31 until some time in 1943. Petitioners did testify that they kept some books in Belgium, which they left behind at the time they fled from that country. We are, however, unable to find from this testimony or any other evidence of record that any such books as may have been kept in Belgium were kept in accordance with an accounting period ended March 31, 1940, which had been definitely established as such before its close. The evidence is clear that petitioners, as individuals, kept no regular set of books in the United States until April 1943. Section 41 of the code provides that "if the taxpayer has no annual accounting period or does not keep books, the net income shall be

computed on the basis of the calendar year." And section 19.41–4 of Regulations 103 provides:

\* \* \* No fiscal year will, however, be recognized unless before its close it was definitely established as an accounting period by the taxpayer and the books of such taxpayer were kept in accordance therewith. A person having no such fiscal year must make his return on the basis of the calendar year.

We, accordingly, hold that petitioners must compute their tax liabilities upon the basis of calendar years ended December 31, 1940 and 1941, as the respondent has determined. Cf. *Max H. Stryker, supra;* and *Louis M. Brooks,* 6 T. C. 504. Therefore, the adjustments agreed upon in paragraph 7 of each of the stipulations will be made in a recomputation under Rule 50.

*Issue 3.*—Under this issue petitioners contend they are not taxable in the United States on any part of the income from the Canadian partnership which was earned during the calendar years 1940 and 1941. The respondent contends that petitioners are taxable on the above mentioned income from the Canadian partnership under the language of section 182 of the Internal Revenue Code.[5] Petitioners cite as the applicable law and regulations section 42 of the Internal Revenue Code [6] and section 19.42–2 of Regulations 103.[7] Section 42 of the code was amended by section 114 of the Revenue Act of 1941 by inserting before the first sentence thereof "(a) GENERAL RULE.—" and by inserting at the end of such section a new subsection, (b), not here material. Section 118 of the Revenue Act of 1941 provided that "The amendments made by this title \* \* \* shall be applicable only with respect to taxable years beginning after December 31, 1940." Although this amendment is applicable only to the calendar year 1941 and is not applicable with respect to the calendar year 1940, now

---

[5] SEC. 182. TAX OF PARTNERS.

In computing the net income of each partner, he shall include, whether or not distribution is made to him—

\* \* \* \* \* \* \*

(c) His distributive share of the ordinary net income or the ordinary net loss of the partnership, computed \* \* \*. [NOTE: The parties have stipulated how it is to be "computed".]

[6] SEC. 42. PERIOD IN WHICH ITEMS OF GROSS INCOME INCLUDED.

The amount of all items of gross income shall be included in the gross income. for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under section 41, any such amounts are to be properly accounted for as of a different period. \* \* \*

[7] SEC. 19.42–2. *Income not reduced to possession.*—Income which is credited to the account of or set apart for a taxpayer and which may be drawn upon by him at any time is subject to tax for the year during which so credited or set apart, although not then actually reduced to possession. To constitute receipt in such a case the income must be credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made, and must be made available to him so that it may be drawn at any time, and its receipt brought within his own control and disposition. A book entry, if made, should indicate an absolute transfer from one account to another. If a corporation contingently credits its employees with bonus stock, but the stock is not available to such employees until some future date, the mere crediting on the books of the corporation does not constitute receipt.

under consideration, the rule provided by section 42 (prior to the amendment) was nevertheless in substance a general rule as c. mpared with the specific rule stated in section 182, *supra*, relied upon by the respondent. "It is an old and familiar rule that, 'where there is, in the same statute, a particular enactment, and also a general one, which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment.'" *Monarch Life Insurance Co.*, 38 B. T. A. 801, 805–806, citing *United States* v. *Chase*, 135 U. S. 255, 260; and *Ginsberg & Sons* v. *Popkin*, 285 U. S. 204. Section 182 (c), being a specific provision dealing with the computation of the net income of each partner of a partnership, takes precedence over the general provision of section 42 dealing with the period in which items of gross income are to be included. *Ruud Manufacturing Co.*, 10 T. C. 14. Section 182 (c) provides that, in computing the net income of each partner, he shall include his distributive share of the net income of the partnership whether or not distribution is made to him. In so far as the present issue is concerned, it would make no difference whether petitioners reported their income in accordance with the cash or the accrual method of accounting.

Petitioners nevertheless contend that, because the Canadian Government refused to permit petitioners to bring any of the funds of the Canadian partnership to the United States, they are not taxable on any of the net income of such partnership, under the doctrine of *International Mortgage & Investment Corporation*, 36 B. T. A. 187. The taxpayer in that case was a Maryland corporation. Its taxable year was the calendar year 1931. In years prior to 1931 the taxpayer took dollars into Germany when the rate of exchange was 4.198 marks to the dollar, and used the money to purchase German mortgages at less than face value. In July 1931 there was a banking crisis in Germany and Germany thereafter prohibited the transfer out of Germany of marks received on repayment of capital sums without permission of the German Foreign Exchange Office. During the period July 13 to December 31, 1931, mortgages which had cost the taxpayer 3,352,398.29 reichsmarks when reichsmarks had an exchange value of 4.198 to the dollar, were repaid to the taxpayer's agents in Germany in the amount of 4,208,408.21 reichsmarks. The Commissioner determined that the excess of 856,009.92 reichsmarks was income to the taxpayer at the rate of 4.198 reichsmarks to the dollar. After July 12, 1931, no part of the above 4,208,408.21 reichsmarks could be paid over or credited to the taxpayer in such a way that the taxpayer could

obtain or use the money outside of Germany. The United States Board of Tax Appeals (now this Court) found as a fact that "There was no market in 1931 for the restricted marks, and no one could form an opinion as to their value at that time." Based primarily upon that finding, it was held that the taxpayer realized no gain during 1931 from the receipt of the blocked marks.

The *International Mortgage* case was distinguished in *Phanor J. Eder*, 47 B. T. A. 235, as having been decided squarely under the doctrine of "constructive receipt" and not premised upon any specific legislation. We have specific legislation in the instant proceedings, namely, section 182 (c), *supra*. The taxpayer in the *Eder* case was a shareholder of a foreign personal holding company organized in 1936 under the laws of the Republic of Colombia. The taxable year was 1938. Section 337 (a) of the Revenue Act of 1938 provided that "The undistributed Supplement P net income of a foreign personal holding company shall be included in the gross income of the citizens or residents of the United States * * * who are shareholders in such foreign personal holding company * * *." The Colombian company for 1938 had a Supplement P net income of 167,904.98 pesos. It received permission to and did transmit 58,296.60 of these pesos to its stockholders in the United States, with respect to which it claimed and was allowed by the Commissioner a "dividends paid credit" measured in United States dollars at the exchange rate of 57.06 cents per peso. This left an *undistributed* Supplement P net income of 109,608.38 pesos. This undistributed net income could not legally be transferred outside the boundaries of Colombia because of prohibitions imposed by the exchange control laws and regulations of that country, but there was no law of Colombia during 1938 forbidding the spending or investment of pesos within the boundary of that republic. The taxpayer contended that because of these restrictions no part of the undistributed Supplement P net income was taxable to him, notwithstanding the specific provisions of section 337 (a) of the Revenue Act of 1938, *supra*. The Commissioner rejected this contention and determined that the taxpayer was taxable on his share (25 per cent) of the undistributed Supplement P net income of the Colombian company at the current rate of exchange for free pesos of 57.06 cents per peso. We sustained the Commissioner's determination. The Circuit Court of Appeals, Second Circuit, in *Eder* v. *Commissioner*, 138 Fed. (2d) 27, remanded the case to us and, among other things in its opinion, said:

We agree with the taxpayers that the Commissioner and the Tax Court were in error in adopting as the value of "blocked" pesos the current rate of exchange for "free" pesos. It does not follow, however, that the taxpayers must win. * * *

There is nothing in the record to show how economic satisfaction in Colombia can be measured in American dollars. \* \* \* We therefore remand the case to the Tax Court for further consideration of the appropriate measure of valuation, with leave, of course, to any of the parties to introduce further evidence hearing on that particular subject.

We do not agree with taxpayers' argument that inability to expend income in the United States, or to use any portion of it in payment of income taxes, necessarily precludes taxability. In a variety of circumstances it has been held that the fact that the distribution of income is prevented by operation of law, or by agreement among private parties, is no bar to its taxability. See, e. g., *Heiner* v. *Mellon*, 304 U. S. 271, 281, 58 S. Ct. 926, 82 L. Ed. 1337; *Helvering* v. *Enright's Estate*, 312 U. S. 636, 641, 61 S. Ct. 777, 85 L. Ed. 1093; cf. *Helvering* v. *Bruun*, 309 U. S. 461, 60 S. Ct. 631, 84 L. Ed. 864. \* \* \*

Upon rehearing it was found that the 109,608.38 pesos had a value of 28.53 cents per peso in United States money instead of 57.06 cents and the deficiencies were recomputed in accordance with that finding.

We followed the *Eder* case, *supra*, and were affirmed by the Second Circuit in *Edmond Weil, Inc.* v. *Commissioner*, 150 Fed. (2d) 950.

In the instant proceedings petitioners offered no proof as to what the laws of Canada were relative to the transmission of funds from that country to the United States. At the time Henri arranged with Canada to bring the $90,725.75 representing either the cost or value of the diamonds petitioners had shipped from Antwerp to Canada in 1939, he was told that petitioners would not be permitted to bring any further funds from Canada to the United States during the war. As to the nature of these restrictions we were left uninformed, but we shall assume they were effective to prevent the transmission of any of these funds to the United States. However, there is no evidence to show that petitioners did not at all times have free use of the income in question in the conduct of their partnership business in Canada.

It is our opinion, and we hold, that, under the provisions of section 182 (c) of the code and upon the authority of the *Eder* and *Weil* cases, *supra*, the petitioners are taxable for the calendar years 1940 and 1941 on the respective amounts of income from the Canadian partnership mentioned in the parts of the stipulations of facts set out in our findings. Cf. *Heiner* v. *Mellon*, 304 U. S. 271.

*Issue 4.*—Are petitioners entitled to a foreign tax credit for income taxes paid or accrued to Canada? The applicable statutory provisions for the calendar year 1940 are sections 23 (c) (2), unamended, and 131 (a), (b), and (d) of the Internal Revenue Code as amended by section 216 of the Revenue Act of 1939, which, so far as they are

relevant, are set out in the margin.[8] The applicable statutory provisions for the calendar year 1941 are section 23 (c) (1) (C) of the code, as amended by section 202 (a) of the Revenue Act of 1941 and section 158 (b) of the Revenue Act of 1942, and section 131 (a) of the code as amended by section 158 (a) of the Revenue Act of 1942. In view of our later holding herein on this issue, we do not set out these provisions in the margin, since their differences from the applicable statutory provisions for the calendar year 1940 as set out in footnote 8 are not such as would make any change in our holding for the two calendar years here involved.

Max did not signify in his return his desire to have the benefit of section 131. Henri did so signify, but did not claim any credit for taxes paid or accrued to Canada. The record does not show that either

---

[8] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\*　　\*　　\*　　\*　　\*　　\*

(c) TAXES GENERALLY.—Taxes paid or accrued within the taxable year, except—

\*　　\*　　\*　　\*　　\*　　\*

(2) income, war-profits, and excess-profits taxes imposed by the authority of any foreign country or possession of the United States; but this deduction shall be allowed in the case of a taxpayer who does not signify in his return his desire to have to any extent the benefits of section 131 (relating to credit for taxes of foreign countries and possessions of the United States).

SEC. 131. TAXES OF FOREIGN COUNTRIES AND POSSESSIONS OF UNITED STATES.

(a) ALLOWANCE OF CREDIT.—If the taxpayer signifies in his return his desire to have the benefits of this section, the tax imposed by this chapter, except the tax imposed under section 102, shall be credited with:

\*　　\*　　\*　　\*　　\*　　\*

(3) ALIEN RESIDENT OF UNITED STATES.—In the case of an alien resident of the United States, the amount of any such taxes paid or accrued during the taxable year to any foreign country, if the foreign country of which such alien resident is a citizen or subject, in imposing such taxes, allows a similar credit to citizens of the United States residing in such country; and

(4) PARTNERSHIPS AND ESTATES.—In the case of any such individual who is a member of a partnership or a beneficiary of an estate or trust, his proportionate share of such taxes of the partnership or the estate or trust paid or accrued during the taxable year to a foreign country or to any possession of the United States, as the case may be.

(b) LIMIT ON CREDIT.—The amount of the credit taken under this section shall be subject to each of the following limitations:

(1) The amount of the credit in respect of the tax paid or accrued to any country shall not exceed the same proportion of the tax against which such credit is taken, which the taxpayer's net income from sources within such country bears to his entire net income, in the case of a taxpayer other than a corporation, or to the normal-tax net income, in the case of a corporation, for the same taxable year; and

(2) The total amount of the credit shall not exceed the same proportion of the tax against which such credit is taken, which the taxpayer's net income from sources without the United States bears to his entire net income, in the case of a taxpayer other than a corporation, or to the normal-tax net income, in the case of a corporation, for the same taxable year.

\*　　\*　　\*　　\*　　\*　　\*

(d) YEAR IN WHICH CREDIT TAKEN.—The credits provided for in this section may, at the option of the taxpayer and irrespective of the method of accounting employed in keeping his books, be taken in the year in which the taxes of the foreign country or the possession of the United States accrued, subject, however, to the conditions prescribed in subsection (c) of this section. If the taxpayer elects to take such credits in the year in which the taxes of the foreign country or the possession of the United States accrued, the credits for all subsequent years shall be taken upon the same basis, and no portion of any such taxes shall be allowed as a deduction in the same or any succeeding year.

petitioner claimed any credit for taxes paid or accrued to Canada until they filed their respective motions "for leave to amend petition," as noted in our preliminary statement in which motion claims were made for taxes "paid" to Canada. We need not and do not decide whether these claims for credit are timely, for, assuming that they are, there are other reasons why the claims must be denied.

The respondent contends that petitioners do not meet the condition precedent provided in section 131 (a) (3), *supra*, which is the same for both years and is as follows:

In the case of an alien resident of the United States, the amount of any such taxes paid or accrued during the taxable year to any foreign country, if the foreign country of which such alien resident is a citizen or subject, in imposing such taxes, allows a similar credit to citizens of the United States residing in such country.

During the taxable years here involved petitioners were citizens or subjects of Belgium. Section 131 (a) (3) of the Revenue Act of 1928 is identical with the above provision of the code. Article 695 (b) of Regulations 74, promulgated under the 1928 Act, provided in part as follows:

Art. 695. Countries which do or do not satisfy the similar credit requirement. * * *

(b) The following is an incomplete list of the countries which do not satisfy the similar credit requirement of section 131 (a) (3) of the Revenue Act of 1928, either because such countries do not allow any credit to citizens of the United States residing in such countries for the amount of income taxes paid to the United States, or because such countries do not impose any income taxes: * * * Belgium * * *.

As far as we have been able to determine, the status of Belgium as being a country which does or does not satisfy the similar credit requirement has not changed since the promulgation of Regulations 74. If it has changed, the burden would be upon petitioners to prove it and they have offered no evidence to show that Belgium satisfies the similar credit requirement of the code. In their brief petitioners say:

It is the petitioners' contention that the reciprocal credit provision of Section 131 (a) (3) is not material in that it refers to a set of facts entirely different from that which exists in the instant case. * * * The petitioners further contend that their claim for credit for foreign income taxes paid to Canada is governed by the Tax Convention with Canada * * *.

The "Tax Convention" thus relied upon by petitioners is the tax convention and protocol between the United States and Canada which was proclaimed by the President of the United States on June 17, 1942, and made effective as of January 1, 1941. On December 31, 1942, the Commissioner issued comprehensive regulations as T. D. 5206 (1943 C. B. 526) to govern procedure under this tax convention

and protocol, which tax convention and protocol is set out in full under section 7.20 of the regulations. The portions of the tax convention and protocol relied upon by petitioners are set forth in the margin.[9]

We do not think the portions of the tax convention and protocol relied upon by petitioners are of any help to petitioners. They do not enlarge the statutory provisions of section 131 of the code. Article XV of the convention simply states that the United States agrees to allow as a deduction from taxes imposed by the United States the appropriate amount of such taxes paid to Canada "In accordance with

---

[9] ARTICLE XV.

In accordance with the provisions of section 8 of the Income War Tax Act as in effect on the day of the entry into force of this convention, Canada agrees to allow as a deduction from the Dominion income and excess profits taxes on any income which was derived from sources within the United States of America and was there taxed, the appropriate amount of such taxes paid to the United States of America.

In accordance with the provisions of section 131 of the United States Internal Revenue Code as in effect on the day of the entry into force of this convention, the United States of America agrees to allow as a deduction from the income and excess profits taxes imposed by the United States of America the appropriate amount of such taxes paid to Canada.

ARTICLE XVI.

Where a taxpayer shows proof that the action of the revenue authorities of the contracting States has resulted in double taxation in his case in respect of any of the taxes to which the present convention relates, he shall be entitled to lodge a claim with the State of which he is a citizen or resident or, if the taxpayer is a corporation or other entity, with the State in which it was created or organized. If the claim should be deemed worthy of consideration, the competent authority of such State may consult with the competent authority of the other State to determine whether the double taxation in question may be avoided in accordance with the terms of this convention.

\* \* \* \* \* \* \*

PROTOCOL.

At the moment of signing the convention for the avoidance of double taxation, and the establishment of rules of reciprocal administrative assistance in the case of income taxes, this day concluded between the United States of America and Canada, the undersigned plenipotentiaries have agreed upon the following provisions and definitions:

1. The taxes referred to in this convention are:
   (a) for the United States of America: the Federal income taxes, including surtaxes, and excess-profits taxes.
   (b) for Canada: the Dominion income taxes, including surtaxes, and excess-profits taxes.

2. In the event of appreciable changes in the fiscal laws of either of the contracting States, the Government of the two contracting States will consult together.

3. As used in this convention:
   (a) the terms "person," "individual" and "corporation" shall have the same meanings, respectively, as they have under the revenue laws of the taxing State or the State furnishing the information, as the case may be;
   (b) the term "enterprise" includes every form of undertaking, whether carried on by an individual, partnership, corporation or any other entity;
   (c) the term "enterprise of one of the contracting States" means, as the case may be, "United States enterprise" or "Canadian enterprise";
   (d) the term "United States enterprise" means an enterprise carried on in the United States of America by an individual resident in the United States of America or by a corporation, partnership or other entity created or organized in or under the laws of the United States of America, or of any of the States or Territories of the United States of America;
   (e) the term "Canadian enterprise" is defined in the same manner mutatis mutandis as the term "United States enterprise."

the provisions of section 131 of the United States Internal Revenue Code as in effect on the day of the entry into force of this convention * * *." Section 7.35 of the regulations issued as T. D. 5206, *supra*, provides:

Sec. 7.35. *Credit Against United States Tax Liability For Income Tax Paid To Canada.*—For the purpose of avoidance of double taxation, Article XV provides that, on the part of the United States, there shall be allowed against the United States income and excess profits tax liability a credit for any such taxes paid to Canada by United States citizens or domestic corporations. Such principle also applies in the case of a citizen of Canada residing in the United States. Such credit, however, is subject to the limitations provided in section 131, Internal Revenue Code (relating to the credit for foreign taxes). See sections 19.131–1 to 19.131–8, Regulations 103. The article is complementary to the provisions of Article XVII, which provides that the United States in ascertaining the income and excess profits tax of its citizens and residents and corporations may take into the basis upon which such taxes are imposed all items of income as though the convention had not come into effect.

In view of the specific provision in article XV of the convention wherein the "appropriate amount" is to be allowed in accordance with "the provisions of section 131" and in view of the regulations issued thereunder, we hold that section 131 (a) (3) of the code is not only material, but is controlling; and, since petitioners have not shown that Belgium satisfies the similar credit requirement of section 131 (a) (3), it follows that petitioners are not entitled to any credit for income taxes either paid or accrued to Canada. As a result of this holding we need not consider the question whether if petitioners were entitled to a credit it should be for taxes "paid" or for taxes "accrued." Petitioners have contended and argued both ways in their brief.

We think, however, that, since petitioners are not entitled to any credit for taxes either paid or accrued to Canada under section 131, *supra*, they should be allowed as deductions from gross income for the calendar years 1940 and 1941, under section 23 (c) (1) (C) of the code, as amended, the amounts paid to the Canadian Government on the partnership income. The parties have entered into detailed stipulations in each case covering the amounts of Canadian partnership income, the amounts of Canadian income taxes accrued and paid, and the respective shares of this income and these taxes allocable to each partner, depending in each case as to whether we hold petitioners entitled to use the fiscal year basis, as they contend, or whether we sustain the Commissioner in putting them on the calendar year basis. Effect will be given to the facts thus stipulated in determining in each case the deductions which are allowable to each petitioner for Canadian income tax so paid on the partnership income here involved.

*Decisions will be entered under Rule 50.*