THEODORE J. SCARDINA, AS POSSESSOR OF CERTAIN CASH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Scardina v. Commissioner
Docket No. 26778-84.
United States Tax Court
T.C. Memo 1988-20; 1988 Tax Ct. Memo LEXIS 20; 54 T.C.M. (CCH) 1544; T.C.M. (RIA) 88020; January 14, 1988. Stanley P. Gimbel, for the petitioner. Andrew A. Vanore, III, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined that petitioner, an artificial entity, the "possessor of certain cash," created by operation of section 6867, I.R.C. 1954, had a deficiency in Federal income tax in the amount of $ 26,500 for the taxable year ending December 31, 1983. The primary issue before us is whether petitioner is liable for the deficiency under section 6867, I. *23 R.C. 1954. For convenience, our findings of fact and opinion are combined. Some of the facts have been stipulated. The stipulation of facts and related exhibits are incorporated herein by this reference. Theodore J. Scardina (Scardina) is a resident of Ft. Lauderdale, Florida. On the evening of September 9, 1983, Scardina went to Logan International Airport (Logan Airport or the airport) in Boston, Massachusetts, and attempted to board a Delta Airlines flight to Ft. Lauderdale, Florida. At the security checkpoint for passengers departing on Delta Airlines, he placed a soft, blue suitcase on the conveyor belt leading to the X-ray machine. On examination of the bag under X-ray, the security guard manning the X-ray machine became suspicious that the bag contained a large amount of cash. The guard brought the bag to the attention of a Massachusetts state trooper who was present at the security checkpoint. That state trooper questioned Scardina about the bag and its contents, and then called other state troopers, who were patrolling the airport, to the security checkpoint. Two troopers arrived at the checkpoint, questioned Scardina, and then brought him to the state police office *24 located at the airport. They then called for John J. Kelley (Kelley or Detective Kelley), the police detective then on duty at Logan Airport. [1]
At the time of trial, Detective Kelley had been a Massachusetts State Trooper for 15 years. In 1983, *25 he was stationed at Logan International Airport in Boston. As a detective at the airport, Kelley's duties were to investigate crimes occurring in or around the airport. In fulfilling these duties, Kelley would often cooperate with Federal authorities such as the Customs Service, the Drug Enforcement Agency, the FBI, the Federal Aviation Administration, and the Coast Guard. By the time Detective Kelley arrived at the police office, the troopers had opened the bag Scardina was carrying and had found it to be filled with money. The troopers explained to Kelley in the presence of Scardina that Scardina had attempted to put the bag through the X-ray machine at the security checkpoint for Delta Airlines, that they had determined the bag to be full of money, and that on questioning Scardina had denied that either the bag or the money belonged to him. At that point, Kelley himself questioned Scardina. Scardina recounted to Kelley only the barest outline of the events that led up to his being stopped at Logan Airport. He told Kelley that while he was in Ft. Lauderdale, he was given a bus ticket to Boston, $ 200 in cash, and an airplane ticket back to Ft. Lauderdale by bus on September 6, 1983 and *26 arrived in Boston early on September 8th. During the next one and one half days in Boston, "he just goofed off". At some point while in Boston, he visited a Holiday Inn where he was given the soft, blue suitcase which he had been sent to pick up. He claimed that he did not remember at which Holiday Inn he picked up the suitcase or even where he spent the night before being stopped at the airport. On his return to Ft. Lauderdale, he was to put the bag in a locker at the Ft. Lauderdale airport. Outside of these basic facts, Scardina's story was vague. He professed not to remember the details of the few days leading up to the airport incident. He could not tell Kelley on what bus line he traveled to Boston, what he did when he arrived in Boston, or where he stayed in Boston. Further, he claimed that he did not know the person for whom he was bringing the bag back to Florida. While Scardina admitted that he had been given the bag and had been carrying it to the security checkpoint, he was evasive when asked for details about how he received possession of the bag. Further, he claimed that he did not know the person who gave him the bag. He told Kelley that on his return to Ft. *27 Lauderdale, he was supposed to put the bag in a locker at the Ft. Lauderdale airport, but he could not remember which locker he was to put it in. After obtaining Scardina's consent, Kelley searched Scardina. In a purse that Scardina was carrying, Kelley found a receipt showing that Scardina had spent the previous night in the Sheraton Inn at La Guardia Airport in New York. In the same purse, he found a white envelope containing two hundred dollars and "an official document of the Hialeah Police Department questioning the criminal background of" a person with a Hispanic surname. Scardina was also carrying a leather garment bag, in which Kelley found a device used to detect police radar. Scardina gave inconsistent and evasive explanations of how he got to the hotel in New York the night before and how he planned to use the radar detector. He had previously told Kelley that he had come straight to Boston from Ft. Lauderdale by bus. When confronted with the hotel receipt, he said he had driven from Boston to New York with a friend the night before. When asked to describe the car in which they drove, he said they had taken a bus. Similarly, when Kelley questioned Scardina about *28 the radar detector, Scardina responded that he had used it for the trip to Boston. When reminded that he had taken a bus, he said it was for the ride back to Ft. Lauderdale. When asked how it would be of help to him when he was flying back, his response was that he was bringing it back to Ft. Lauderdale for a friend. Scardina did acknowledge ownership of the $ 200 found in the purse. Kelley returned the $ 200 to Scardina and obtained a receipt therefor, signed by Scardina. Kelley then counted the money discovered in the bag in the presence of Scardina and found there to be $ 53,000, in bundles of $ 1,000 each. Scardina again denied that the $ 53,000 belonged to him. Kelley seized the $ 53,000 and told Scardina that it would be turned over to the District Attorney pending further investigation. He provided Scardina with a receipt, signed by Kelley and the two other troopers involved, stating that the money was taken from him at Logan Airport. Scardina was not arrested and no criminal action was thereafter taken against him in connection with the $ 53,000. On September 30, 1983, an assistant district attorney, acting for the Commonwealth of Massachusetts, petitioned the Superior *29 Court for Suffolk County in a proceeding in rem to order forfeiture of $ 26,500 of the cash taken from Scardina. The petition took the form of a complaint against "TWENTY SIX THOUSAND FIVE HUNDRED DOLLARS IN U.S. CURRENCY", half of the $ 53,000 seized from Scardina. The complaint was based upon the allegations that the money was owned by Scardina, and that it "was intended to be used in the procurement, manufacturing, compounding, processing, delivery or distribution of a controlled substance, or that it constitutes the proceeds of a sale of a controlled substance" in violation of Massachusetts law. Also on September 30, 1983, the Commonwealth of Massachusetts requested that the court issue a preliminary order "authorizing the securing and holding of the above money pending the outcome of the forfeiture proceeding against the money". The request was made based, at least in part, on an affidavit prepared by Detective Kelley. On December 13, 1983, a default judgment was entered against the cash and it was forfeited to the Commonwealth of Massachusetts. The remaining $ 26,500 was turned over to the Internal Revenue Service in connection with the events set forth in the next paragraph *30 herein. Within a few days of the September 9 incident, Detective Kelley's supervisor and the Internal Revenue Service were in contact in connection with an IRS levy against the $ 53,000 seized. In accordance with sections 6851 and 6867, the IRS then sent Scardina, in his capacity as possessor of certain cash under section 6867, a "Notice of Termination Assessment of Income Tax". That notice stated that the IRS had "found that the collection of income tax for the period January 1, 1983 to September 13, 1983 is jeopardized or rendered ineffectual" because Scardina was found in possession of the $ 53,000 which he did not claim as belonging to himself or to an individual whose identity could be readily ascertained. As a result, $ 26,500 in income tax for the shortened 1983 year was determined, under the presumptions contained in section 6867(a) and (b), to be due and payable from the cash seized. On April 26, 1984, as required under section 6851(b), the Commissioner sent Scardina, as possessor of certain cash, a notice of deficiency for the tax year ended December 31, 1983. In the notice, the Commissioner determined a deficiency of $ 26,500 based on Scardina's possession of $ 53,000 *31 which "you did not claim as yours or belonging to another person whose identity the Secretary can readily ascertain and who acknowledges ownership of such cash". The deficiency was determined to be payable from the cash found in Scardina's possession. The notice informed Scardina that the determination therein "is independent of and has no effect upon your personal income tax liability for the calendar year 1983". It used a taxpayer identification number different from Scardina's individual social security number. On July 24, 1984, petitioner filed a petition in this Court. By notice dated June 10, 1985 the Internal Revenue Service informed Scardina that it had received an estimated tax payment in the amount of $ 26,500 on September 14, 1983. The payment was applied to the tax liability for the year ended September 30, 1983 of the taxpayer with the identification number of the possessor of cash, not Scardina's personal social security number. On August 14, 1986, only about five months prior to the trial of this case, Scardina filed his personal income tax return for a short tax year beginning January 1, 1983, and ending September 30, 1983. In filing the return, he used his *32 own social security number as his taxpayer identification number, not the number assigned to the possessor of cash. That return was prepared by petitioner's counsel herein, and gave as Scardina's "home address" the office address of counsel. On that return, Scardina reported "Other income" described as "fees & commissions" in the amount of $ 31,200. He reported a resulting tax liability of $ 6,558 and "estimated tax payments" made by him in the amount of $ 26,500. He claimed a refund in the amount of $ 19,942, thereby attempting to have the $ 26,500 applied to his personal tax liability. By letter dated October 14, 1986, counsel requested that the IRS credit Scardina's personal tax liability with the $ 26,500 seized. No persuasive evidence was presented to show that Scardina ever filed any income tax return for the full year 1983 or for any other year either as an individual or as the statutory possessor of cash. At trial, Scardina testified that during 1983 he earned part of the $ 53,000 which was found in his possession on September 9, 1983. As to the balance of the cash, he claimed that he either earned it in years prior to 1983 or borrowed it. He stated that although the *33 money belonged to him, when asked about it at Logan International Airport on September 9, 1983, he lied, denying ownership of the cash. His explanation for denying ownership of the cash at that time was that he was afraid to acknowledge ownership of it because he had planned to use the cash in an illegal transaction. He testified that he travelled from Ft. Lauderdale to Boston with the cash, planning to buy cocaine with it in Boston. When he arrived in Boston, after failing to contact the person from whom he planned to buy the cocaine, he developed "cold feet", and then attempted to return to Ft. Lauderdale with the cash. It was at this point, according to his testimony, that Scardina was stopped at Logan Airport. It is Scardina's position here that he is the true owner of the cash and that the assessment against him as a possessor of cash should be replaced, under section 6867(c), I.R.C. 1954, with an assessment against him as an individual. As a preliminary matter, however, petitioner claims that the notice of deficiency issued to the possessor is invalid for two reasons. The first reason given is that the notice was issued for the wrong taxable year; the second is that the *34 notice was untimely. Central to both claims is the fact that some of the Government's correspondence with petitioner refers to a tax year ending September 30, 1983, for the possessor of cash, while the notice of deficiency is issued for a tax year ending December 31, 1983. Although it is unclear to us why the tax year actually involved was referred to in such correspondence as the year ending September 30, 1983, [2] we nonetheless conclude that such reference to a year ending September 30, 1983, does not warrant a holding for petitioner on the issue of the validity of the notice of deficiency. When a termination assessment is determined by the Secretary to be justified, the tax is assessed and becomes immediately due and payable. Section 6851(a)(1), I.R.C. 1954; section 1.6851-1(a), Income Tax Regs. The tax so assessed is a tax for the period beginning on the first day of the current taxable year and ending on the date of the assessment. Section 6851(a)(2), I.R.C. 1954; section 1.6851-1(a)(2), Income Tax Regs. Thus the termination assessment terminates the taxable year *35 for the purpose of computing the amount of tax to be assessed and collected under the expedited termination assessment procedure. That termination occurred here on September 13, 1983. However, it did not terminate the taxable year for all purposes, and it clearly did not cut short the taxable year for the purpose of issuing a notice of deficiency. This is made explicit by subsection 6851(b), which requires that a notice of deficiency based on the taxpayer's "full taxable year (determined without regard to any action taken under subsection (a))" be sent after the assessment under section 6851. [3]
What constitutes a taxpayer's taxable year is governed by section 441, I.R.C. 1954. In accordance with the regulations *36 under section 441, a taxpayer generally adopts his initial taxable year by filing a timely return for that taxable year. Section 1.441-1(b)(3), Income Tax Regs. The taxable year which may be selected is limited. It must be "the taxpayer's annual accounting period, if it is a calendar year or a fiscal year." Section 441(b)(1), I.R.C. 1954; section 1.441-1(b)(1)(i), Income Tax Regs. See Century Data Systems, Inc. v. Commissioner,80 T.C. 529, 531 (1983); Dougherty v. Commissioner,60 T.C. 917, 932-933 (1976); Atlas Oil and Refining Corp. v. Commissioner,17 T.C. 733, 738 (1951). If the taxpayer keeps no books and has no annual accounting period, his tax year is "the calendar year." Section 441(b)(2) and (g), I.R.C. 1954; Maclean v. Commissioner,73 T.C. 1045, 1051 (1980); Freudmann v. Commissioner,10 T.C. 775, 793-794 (1948). In limited circumstances, which have not been argued to be applicable here, a return is required to be made for a period of less than twelve months. Section 1.443-1(a), Income Tax Regs. In that case, the taxable year is "the [short] period for which the return is made." Section *37 441(b)(3), I.R.C. 1954. Since petitioner here is an artificial entity created by operation of section 6867 in 1983, it is clear that petitioner neither filed a return [4] and thereby adopted a taxable year, nor had an annual accounting period or any books or records on which to base a tax year at the time the notice of deficiency was mailed. Consequently, petitioner has not shown that the year ending December 31, 1983, the year on which the notice of deficiency is based, is not petitioner's correct taxable year. The notice of deficiency issued to petitioner was required to be based on the taxpayer's full taxable year for 1983. That full taxable year has not be shown to be anything other than the year ending December 31, 1983, which year appeared in the notice of deficiency. [5] The mere fact that some correspondence from the Internal Revenue Service referred to a September 30, 1983, taxable year for petitioner does not invalidate the notice of deficiency based on the calendar year 1983. *38 Petitioner also argues that the notice of deficiency is invalid because untimely. The expedited assessment procedure used against petitioner was that allowed under section 6851, I.R.C. 1954. In the case of such an assessment, "the Secretary" is required to mail a notice of deficiency "for the taxpayer's full taxable year * * * within 60 days after the later of (i) the due date of the taxpayer's return for such taxable year (determined with regard to any extensions), or (ii) the date such taxpayer files such return." Section 6851(b), I.R.C. 1954. We have already found that the correct taxable year for petitioner is a calendar year. Consequently, the due date of that return was April 15, 1984. Section 6072(a), I.R.C. 1954. The notice of deficiency, mailed on April 26, 1984, was clearly mailed "within 60 days after" the due date of the return and is therefore timely in accordance with section 6851(b). [6]
*39 We now turn to the primary issue before us. Section 6867, I.R.C. 1954, was added to the Code in 1982 [7] in order to make clear that the termination and jeopardy assessment procedures of section 6851 and 6861 respectively were available to the Commissioner when cash was seized but the owner of the cash was unknown. H. Rept. No. 97-760, 582 (1982), 1982-2 C.B. 654. The section thus enacted provides, in part, as follows: (a) General Rule. -- If the individual who is in physical possession of cash in excess of $ 10,000 does not claim such cash -- (1) as his, or (2) as belonging to another person whose identity the Secretary can readily ascertain and who acknowledges ownership of such cash, then, for purposes of sections 6851 and 6851, it shall be presumed that such cash represents gross income of a single individual for the taxable year in which the possession occurs, and that the collection of tax will be jeopardized by delay. (b) Rules for Assessing. -- In the case of any assessment resulting from the application of subsection (a) -- (1) the entire amount of the cash shall be treated as taxable income for the taxable year in which the possession occurs, *40 (2) such income shall be treated as taxable at a 50-percent rate, and (3) except as provided in subsection (c), the possessor of the cash shall be treated (solely with respect to such cash) as the taxpayer for purposes of chapters 63 and 64 and section 7429(a)(1). Petitioner does not argue that a termination assessment under section 6851 should not have been made against it in accordance with section 6867(a). Clearly, in September of 1983, the requirements of that section were met. At the time he was stopped at Logan Airport, Scardina was carrying $ 53,000 in cash and he denied ownership of that $ 53,000. On questioning, he failed to identify the person who allegedly gave him the money in Boston, the person to whom he was to deliver it in Ft. Lauderdale, or anyone else who might potentially be identified as the owner of the cash. There is no question that in these circumstances, the provisions of section 6867 were properly invoked. Petitioner argues instead that despite his protestations to the contrary when he was stopped at Logan Airport, he is the true owner of the cash and, consequently, that subsection (c) of section 6867, should *41 come into play. Section 6867(c) is titled "Effect of Later Substitution of True Owner" and it provides that: If, after an assessment resulting from the application of subsection (a), such assessment is abated and replaced by an assessment against the owner of the cash, such later assessment shall be treated for purposes of all laws relating to lien, levy and collection as relating back to the date of the original assessment.
Petitioner urges this Court to rule that "pursuant to Section 6867(c), the assessment under Section 6867(c) [against the possessor] must be abated and replaced by an assessment against the true owner [the individual, Scardina]." Respondent argues that this Court does not have jurisdiction to determine whether Scardina is the true owner of the cash, and alternatively, that if the Court does have such jurisdiction, we should find that Scardina is not the true owner. This Court has previously been faced with the issue of our jurisdiction to decide the owner of the cash seized, in People's Loan & Trust Co., as Possessor of Certain Cash v. Commissioner,89 T.C. 896 (1987), and Matut, as Possessor of Certain Cash v. Commissioner,86 T.C. 686 (1986). *42 We need not revisit that issue here except to note that this Court has previously held, on those two occasions, that in a proceeding initiated by the petition of the statutory possessor, we may "determine the identity of the 'true owner.'" Matut v. Commissioner,86 T.C. at 691. The consequences of a determination of the true owner do not need to be addressed here because we are not persuaded that Scardina is the true owner and, consequently, we uphold the deficiency against the possessor.[8]
*43 To begin with, we found Detective Kelley to be a thoroughly credible witness and we fully accept his account of the events that occurred on September 9, 1983, at Logan Airport. As a result, we are satisfied that at the time he was stopped Scardina repeatedly and unequivocally denied ownership of the cash and told Kelley that he had travelled to Boston to pick up the suitcase filled with cash for a person in Ft. Lauderdale, whom he would not identify. Scardina does not dispute that he denied ownership of the cash and claimed merely to be carrying it for someone else when stopped at Logan Airport. Instead, he now insists that the cash belonged to him and that he was lying when he denied ownership of the cash on September 9, 1983. However, his testimony at trial, which purported to set forth the true story behind his possession of the of the cash, did not ring true. It struck us as simply a transparent attempt to mislead the Court as to the ownership of the cash and thereby have the cash taxed in a manner more favorable than that set out in section 6867(b), I.R.C. 1954. [9] Under section 6867(b)(1) and (2), "the entire amount of the cash shall be treated as taxable income for the *44 taxable year in which the possession occurs" and "such income shall be treated as taxable at a 50-percent rate." Scardina's testimony at trial, and his 1983 return filed August 14, 1986, were clearly but ploys to avoid taxation of the cash under either these statutory presumptions or the rates at which it would be taxed if the true owner had come forward. [10] Instead, petitioner would have us believe that the cash belonged to Scardina and was at least in part included as income in his personal income tax return for the artificially shortened year ending September 30, 1983. Taxation of the individual Scardina in the manner reported on such delinquent 1983 return would result in the cash, to the extent shown as attributable to 1983, being taxed at a much lower rate than the 50 percent rate required by section 6867(b). *45 We had ample opportunity to form a judgment of Scardina's credibility on the stand and we found him to be slippery, evasive, and ready to lie whenever he perceived that a truthful answer might be disadvantageous to him. Further, as evidenced by his behavior when questioned by Detective Kelley at Logan Airport, he was clearly willing to change his story from moment to moment as required by the exigencies of the situation. In our opinion, his testimony at trial was just one more story, this one modeled to suit his need to establish ownership in the instant litigation. We found Scardina's story to be untenable, especially when compared to his original story told to Detective Kelley on September 9, 1983. He testified that he owned the $ 53,000 having earned part of it and borrowed part of it. When asked what was the source of earnings he reported on his truncated 1983 return, he became so confused that his attorney felt compelled to explain his answers to the Court. Moreover, while testifying, he could not pinpoint a source of income for 1983 or prior years from which he could plausibly have saved the $ 53,000. [11] Further, no other evidence of gainful employment or of receipt *46 of either of any income or of a loan of the money, was offered. Given the spotty record developed with respect to his earnings and borrowings, we do not accept Scardina's self-serving testimony that he was the owner of the cash. Additionally incredible is his testimony that he travelled from Ft. Lauderdale to Boston to buy cocaine, but having been unsuccessful was about to return to Ft. Lauderdale with the money when stopped at Logan Airport. According to his testimony, he went to Boston with the $ 53,000 in search of cocaine on the advice of a man he met in a bar in Ft. Lauderdale. However, he could not explain what he planned to do with the cocaine, as for example, where he planned to sell it. We think it more likely that Scardina was a courier, that he was paid the $ 200 found in his purse for his services on behalf of *47 someone else engaged in the illegal drug business, and that he was returning with the cash that he was instructed to receive in Boston when he was stopped at Logan Airport. We are convinced that Scardina is not the true owner of the $ 53,000 cash. Finally, if there ever was a case in which observation of the witness on the stand by the trier of facts could be significant, this is it. Scardina's demeanor on the witness stand and accompanying verbal squirming -- jumping from one explanation to another as holes appeared in his responses -- leave us with the definite conviction that his testimony in the main and in many specific respects was nothing but a tissue of lies. The oath to tell the truth which he made when he took the witness stand obviously meant nothing to him. His ready willingness to bend the truth came through loud and clear, confirming what would otherwise be plainly apparent from a mere reading of the cold record. Accordingly, regardless of whatever view one may hold as to the jurisdiction of the Court to determine the true owner of the cash in a case brought on behalf of the artificial entity (the possessor of cash) as the petitioner, we are satisfied that petitioner *48 has neither established that Scardina is the owner nor has it otherwise carried its burden of proof. Decision will be entered for the respondent.
Footnotes
1. The findings with respect to the events that occurred at Logan Airport on September 9, 1983, were derived almost wholly either from the stipulation of facts or from the testimony of Detective Kelley, who was in charge of the interrogation of Scardina, but who was not present when Scardina was first stopped. At trial, petitioner objected to Kelley's testimony, as hearsay, to the extent it was based on communications made to him by the troopers who were involved in the initial stopping of Scardina. The Court overruled the objection made at trial and relies on the testimony based on those statements. Because the communications made to Kelley by the troopers were made in the presence of Scardina, Kelley's testimony based on those statements comes within the exception to the hearsay rule for a statement which Scardina "has manifested his adoption or belief in its truth". Fed. R. Evid. 801(d)(2)(B)↩. 2. Neither party has offered an explanation for the use of a September 30, 1983, tax year for petitioner. ↩
3. Before the Tax Reform Act of 1976, the Code did not provide for the sending of a notice of deficiency after a termination assessment. When the requirement that a notice of deficiency be sent was added, it was decided that sec. 6851↩ should not "end the taxable year for any purpose other than the computation of the amount of tax to be assessed and collected" under the expedited procedures. S. Rept. No. 94-938, 367 (1976), 1976-3 C.B. (Vol. 3) 405. 4. The only return filed for 1983 was filed by Scardina, as an individual not as the possessor, over two years after the notice of deficiency was mailed.↩
5. Petitioner relies on a case in which the Government admitted that the year used in the notice of deficiency was clearly not the taxpayer's correct taxable year. See Century Data Systems, Inc. v. Commissioner,80 T.C. 529, 531↩ (1983). 6. Although section 6851(b) allows the notice of deficiency to be mailed within 60 days of the later↩ of the due date of the return or the actual filing of the return, clearly if the notice is mailed within 60 days of the earlier of such dates, as it was here, the notice is timely. 7. Pub. L. 97-248, 96 Stat. 619. ↩
8. Petitioner argues that we are precluded from making this finding because, according to petitioner, stipulated documents in the record of this case are inconsistent with that finding. As the basis for his argument, petitioner relies on the following stipulated documents: the complaint filed by the Commonwealth of Massachusetts and the default judgment entered against the cash. The complaint was based in part on the allegation that the cash "is owned by * * * Theodore J. Scardina." Petitioner's argument is that the default judgment resulting from the complaint containing that allegation is a conclusive stipulation that Scardina is the owner of the cash. We do not so view the document as a conclusive stipulation of the ownership of the cash. Instead, we consider it to be a stipulation that a complaint was filed, based in part on the allegation that Scardina was the owner of the cash, and that a default judgment was entered presumably because Scardina "failed to plead or otherwise defend" in accordance with Rule 55, Mass. R. Civ. P. Regardless of whether the judgment would be considered to be an adjudication of that fact for any other purpose, we do not consider it to be a stipulation of that fact here. Moreover, even if it clearly were a stipulation of that fact, we would "refuse to be bound by the stipulation" since that stipulation would be "clearly contrary to facts disclosed by the record." Jasionowski v. Commissioner,66 T.C. 312, 318 (1976). See Weinberg v. Commissioner,44 T.C. 233, 244 (1965), affd., revd on another issue, and remanded 386 F.2d 836 (9th Cir. 1968), cert. denied 393 U.S. 929 (1968); Seatree v. Commissioner,25 B.T.A. 396, 401 (1932), affd. 72 F.2d 67↩ (1934). 9. The ultimate remedy sought is not clear from petitioner's brief. Petitioner states in its opening brief that it would be satisfied with either of the results suggested in the dissenting opinions in Matut v. Commissioner,88 T.C. 1250, at 1259 and at 1261 (1987)↩. 10. As indicated infra,↩ it is our impression that Scardina was merely a courier for someone engaged in the illegal drug business. It is a matter of teasing speculation whether counsel's real client is that other person. However, we give no weight to any such possible speculation in the conclusions that we reach herein. 11. When asked what business or job produced the earnings from which he was able to gather together the $ 53,000, petitioner refused to answer, relying on his Fifth Amendment right. Even if the right was properly invoked, petitioner still bears his burden of proof in this case. See Coulter v. Commissioner,82 T.C. 580, 582↩ n. 2 (1984).