*Decisions will be entered under Rule 50.*

WILLIAM E. ADAMS AND HAZEL M. ADAMS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6017–64. Filed June 14, 1966.

*Albert R. Mugel* and *Timothy C. Leixner*, for the petitioners.
*Stephen M. Miller* and *Julian I. Jacobs*, for the respondent.

TANNENWALD, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes for 1957, 1958, and 1959 in the amounts of $4,431.84, $11,193.23, and $5,127.51, respectively, and asserted an addition to tax of $1,107.96 for 1957 on the ground of failure to file returns. In an amended answer, respondent determined increased deficiencies for these years, based on additional interest income from U.S. sources,[1] and an increased addition to tax for 1957. The deficiencies were grounded on the subjection of petitioners' Canadian source income during the 3 years and certain U.S.-source capital gains realized in 1958 and 1959 to U.S. tax. The issues are (a) whether either or both of the petitioners were residents of the United States during the years in question, (b) whether the U.S.-source capital gains were exempt from U.S. tax under the tax treaty between the United States and Canada, and (c) whether petitioners' failure to file returns in 1957 was due to reasonable cause.

### FINDINGS OF FACT

Some facts are stipulated and are found accordingly.

Petitioners were husband and wife and citizens of Canada during the years involved herein. Petitioners filed a joint Federal nonresident alien income tax return[2] for 1958 with the district director of internal revenue, Jacksonville, Fla. Each of petitioners filed an individual Federal nonresident alien income tax return for 1959 with the director of international operations of the Internal Revenue Service, Washington, D.C. Neither filed a Federal income tax return for 1957.

Petitioner William E. Adams (hereinafter referred to as William) was born in Virginia in 1902 and moved to Canada in 1924. His application for Canadian citizenship in 1930 was granted in 1931. In 1936, he married petitioner Hazel May Paine (hereinafter referred to as Hazel), a Canadian citizen by birth, and they established a home in Simcoe in the province of Ontario, Canada. Petitioners' five children are Canadian citizens and were born in Canada during the period 1937–47.

William has been engaged in the construction business in Ontario since 1944.

---

[1] Aside from differences arising out of the status of petitioners as residents or non-residents, there appears to be no question as to the taxable character of these additional items.

[2] There appears to be no statutory authority for filing such a return. Sec. 6013. All references are to the Internal Revenue Code of 1954.

During the years in question, he was the president, general manager, and owner of 92 percent of the stock of Hi-Way Construction Co., Ltd. (hereinafter referred to as Hi-Way), an Ontario corporation formed by William in 1947 and engaged in bridge and road building in Ontario with its headquarters at Simcoe, Ontario.

The company's construction season was April 15 to December 15, and William divided his time between the construction business and his other Canadian business interests (discussed *infra*), but most of his time was consumed by the construction business.

Hi-Way's business was highly competitive. While actual construction took place between April and December, the company was primarily engaged during February and March in preparing and securing bids on future construction.

During Hi-Way's construction activities William traveled constantly. Each visit to construction sites consumed 2 to 3 days, and he would then return to Simcoe before he visited another site. He spent at most 3 nights per week at the home in Simcoe, where he regularly employed domestic help.

In 1957 and 1958 William owned three farms in which he had invested over $180,000, and in 1959 he owned five farms in which he had invested over $240,000. During this same period Hazel owned three farms which had cost over $120,000. All of the farms were in Ontario and were engaged in tobacco and other general farming operations.

William's principal base of business activity during the years in question was Canada.

During the years in question, William owned a one-half interest valued at over $60,000 in a partnership operating a lumber company in Ontario. The company was originally established by William in 1945. He also owned a one-half interest in unimproved real estate near Simcoe.

During the years in question, petitioners held substantial mortgages on Canadian property and maintained several checking and savings accounts containing substantial sums in the Bank of Montreal, Simcoe, Ontario. Each owned Government of Canada bonds. William also owned life insurance policies with substantial face and cash value issued by Canadian companies.

William voted in Canada, both in Federal and municipal elections.

Prior to 1952, petitioners had made sporadic trips to the United States to visit William's relatives and had made, on the average, biennial trips to Florida for about a month during the winter for a vacation, often taking some of their children who were not in school. In early 1952 petitioners spent 1½ months in Florida following a back injury suffered by William in late 1951.

William's back continued to trouble him and during a 3-week stay in Florida in March 1953 petitioners purchased for approximately $40,000 a furnished house in Daytona Beach, Volusia County, Fla., taking title as tenants by the entireties. William returned to Florida for about 3 days in April to close the transaction.

In September 1953, petitioners executed applications under oath for U.S. immigrant visas and alien registration numbers. William's application contained the following statements:

25. Purpose of going to the United States. *To reside.*

35. I intend to remain in the United States for the following period of time: *Permanently.*

Hazel's answer to question 25 was "to accompany my husband," and her answer to question 35 was "permanently."

Petitioners were admitted to the United States on November 27, 1953, which process consumed less than 1 hour. William used his visa only at the time of original entry. Thereafter, he used his Canadian passport for purposes of identification when crossing the border. Petitioners returned to Canada immediately after their admission.

Petitioners and their children left Canada for Florida within a month after their admission and arrived in Daytona Beach on December 20, 1953. William left Daytona Beach for Canada by car on January 3, 1954, and on January 15 Hazel and the children moved into the house petitioners had purchased in Daytona Beach. William returned to Daytona Beach on January 31 for about 1 month before returning to Canada.

Petitioners' travels to and stays in Florida from 1954 through the years in question were as follows: William would go to Daytona Beach about the end of May and remain there for 10 days or 2 weeks before driving his family to Simcoe. Near the end of August he would drive the family to Daytona Beach and stay about a week before returning to Simcoe. He flew or drove to Daytona Beach for about a week during Thanksgiving and drove down around Christmas for a couple of weeks. His next trip would be at the end of January for 3 weeks or a month. He returned to Daytona Beach around Easter for 2 to 3 weeks. William's stays in Florida aggregated approximately 70 days in any year. Hazel and the children spent approximately 9 to 10 months of each of the years in question in Daytona Beach. In June 1960, Hazel and the children returned to live in Simcoe. Thereafter, petitioners have vacationed in Florida during each winter and the children have visited Florida during the summer months.

All of the furniture and furnishings at all times remained in the house in Simcoe, petitioners taking only bed linens and clothing to Daytona Beach. William did not move his personal clothing from

Simcoe to Daytona Beach, keeping only a pair of pants, some shirts, a fishing rod, a gun, and golf clubs in Florida.

Petitioners considered that their children would benefit from being in Florida, especially since the Florida climate would be helpful to two of their daughters, who suffered from asthma and hay fever. Beginning in January 1954 and continuing through the years in issue, petitioners' children attended public schools in Daytona Beach.

On December 23, 1953, petitioners jointly executed "Manifestation of Domicile, State of Florida, County of Volusia." The document reads as follows:

Before me, the undersigned authority, this day personally appeared William E. Adams and Hazel May Adams his wife—628 N. Peninsula Drive.

Who being first duly sworn, under oath, deposes [sic] and says, that affiants resides in and maintains a place of abode in the City of Daytona Beach, County of Volusia and State of Florida, which they recognize and intends to maintain as their permanent home; affiants declare that they do not maintain a residence at any other place and that they formerly resided at Simcoe, Ontario, Canada and that their abode in Florida constitutes their predominant and principal home, and affiants intends to continue it permanently as such; affiants further declares that they are actual bona fide and legal residents of the State of Florida, and the filing of this affidavit is to be accepted by all persons or any Court as proof of such legal residence.

Beginning in 1954 and continuing through the years in issue, petitioners applied for, and the Tax Assessor of Volusia County, Fla., granted, an annual Florida homestead tax exemption of $5,000 on their Daytona Beach house. The 1958 application contained the following:

I hereby make application for an exemption * * * on the property as described on reverse side [the Daytona Beach house]. I reside thereon and in good faith make the same my permanent home. The statements contained and agreed to herein are true and made in good faith.

(S) WM. & HAZEL M. ADAMS

Petitioners applied for the exemption in order to obtain a reduction in the taxes levied on the Daytona Beach property by Volusia County.

Petitioners opened a joint checking account in a Daytona Beach bank in 1953, which they used to pay household bills in Florida and which they retained through the trial of the instant case. During the years in question, Hazel had a checking account with the same bank and a savings account at another Daytona Beach financial institution. During these same years, Hazel opened joint savings accounts with her children, a joint account with William, and an account in trust for William at a Daytona Beach savings and loan association. Petitioners, with one exception, listed their Daytona Beach address on the various account cards.

Beginning in 1955 and continuing until 1965, petitioners jointly rented a safe-deposit box in a Daytona Beach bank. The box contained only papers relating to their Florida activities, such as deeds

to their Florida real estate and insurance policies on property located in Florida. William maintained a safe-deposit box in Simcoe which contained his life insurance policies and securities belonging to all members of his family.

During the years in question, two automobiles were registered in Florida, one in each of petitioner's names, and two automobiles were registered in William's name in Canada. William occasionally rented an automobile in Florida. Each petitioner possessed a Florida operator's license.

Petitioners filed Canadian individual resident income tax returns during the years in question.

William executed a will in Simcoe in 1958 which recited that he was a resident of Ontario and named his wife and certain Canadian citizens as coexecutors and trustees.

During the years in question petitioners received rental income from an apartment located above the garage adjoining their house in Daytona Beach. The net rental involved was minimal.

Hazel purchased for investment a one-half interest in real estate located in Volusia County for $9,062 in 1955. She sold the interest in 1959 for $19,000. In 1956, petitioners jointly acquired for investment land in Marion County, Fla., for $90,000, and they sold the property in 1958 for about $135,000. William acquired a one-quarter interest in real estate in 1955 in Brevard County, Fla., for use as duck-hunting territory for himself and others connected with Hi-Way.

In May 1957, the Adams Construction Equipment Co. of Orlando, Fla. (hereinafter referred to as Orlando), was incorporated to deal in road-building equipment, and William, who invested $210,000 therein, received 75 percent of its issued stock and became its president and treasurer. In September of that year, Adams Construction Equipment Co. of Miami, Fla. (hereinafter referred to as Miami), was organized as a wholly owned subsidiary of Orlando, and William became its president and treasurer. He did not participate in the day-to-day management of either Orlando or Miami at any time during the years in question.

Shortly after Orlando was formed, one of Hi-Way's employees joined Orlando as office manager and bookkeeper. William soon became dissatisfied with his investment in Orlando, and he was in continuous contact with the office manager regarding the operation of the company. In 1962 he disposed of his interest in Orlando.

William's address on the charter of Orlando, on the tax returns filed by Orlando and Miami during the years in question, and on his application in 1958 for a U.S. social security number was Daytona Beach. Although William received salary from Orlando in 1958 and 1959 and interest income in 1959 from loans to Orlando, William did not file with Orlando in those years U.S. Treasury Form 1078, i.e., a

written statement that he was a resident of the United States. Orlando did not withhold tax on the interest paid to William in 1959.

Petitioners claimed a deduction on their 1958 joint nonresident alien return for charitable contributions of $760 to the Tourist Church of Daytona Beach and $1,000 to the Daytona Beach Art League, and William claimed a charitable deduction on his individual return in 1959 for contributions of $365 to the Tourist Church and $30 to the United Fund of Daytona Beach.

### ULTIMATE FINDINGS OF FACT

William was a nonresident alien of the United States during the taxable years in question.

Hazel was an alien resident of the United States during the taxable years in question.

Hazel's failure to file a return for 1957 was not due to reasonable cause.

### OPINION

### I. *William's Residence*

The first issue is whether William was a nonresident alien of the United States during the years in question and therefore not subject to U.S. tax on his Canadian-source income [3] and U.S.-source capital gains.[4]

"Residence * * * has an evasive way about it, with as many colors as Joseph's coat." *Weible* v. *United States*, 244 F. 2d 158, 163 (C.A. 9, 1957). The determination is factual and must be made through a consideration and balancing of all the elements involved.

The parties have correctly agreed that the question of residence for the purpose of section 872 is to be determined under the laws of the United States. We note in passing that abandonment by William of his residence in Canada is not a necessary prerequisite to a finding of U.S. residence, nor does a finding of U.S. residence require the conclusion that his Canadian residence terminated.

Neither the Code nor the legislative history of section 872(a) or its predecessors offers a test or suggests criteria to be used in determining whether an alien is a resident of the United States. However, regulations promulgated by respondent under section 871 list the following general principles and an important presumption as guides to our determination:

Sec. 1.871-2. Determining residence of alien individuals.

---

[3] Sec. 872.

[4] Under the income tax convention between the United States and Canada, capital gains derived in the United States by certain Canadian residents are exempt from U.S. tax. Income Tax Convention and Protocol with Canada, Mar. 4, 1942, art. VIII, 56 Stat. 1399 (1941), as amended June 12, 1950. Respondent appears to concede that if William is found to be a nonresident alien he is entitled to the benefit of art. VIII.

(b) Residence defined. An alien actually present in the United States *who is not a mere transient or sojourner* is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his *intentions with regard to the length and nature of his stay.* A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. *If he lives in the United States* and has no definite intention as to his stay, he is a resident. *One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient;* but, if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. * * * [Emphasis supplied.]

Sec. 1.871–4. Proof of residence of aliens.

(a) *Rules of evidence.* The following rules of evidence shall govern in determining whether or not an alien within the United States has acquired residence therein for purposes of the income tax.

(b) *Nonresidence presumed. An alien, by reason of his alienage, is presumed to be a nonresident alien.*

(c) Presumption rebutted.—* * *

\*        \*        \*        \*        \*        \*        \*

(2) *Other aliens.* In the case of other aliens, the presumption as to the alien's nonresidence may be overcome by proof—

(i) That the alien has filed a declaration of his intention to become a citizen of the United States under the naturalization laws; or

(ii) That the alien has filed Form 1078 or its equivalent; or

(iii) Of acts and statements of the alien showing a definite intention to acquire residence in the United States or showing that his stay in the United States has been of such an extended nature as to constitute him a resident. [Emphasis supplied.]

Many of the elements involved in the instant situation are merely tangential to our consideration. The situs of a house, bank accounts, safe-deposit boxes, investments and business activities, the registration of automobiles, and donations to Florida charities can be explained on a basis consistent with either conclusion as to William's residence.

The fact that William's wife and children spent the bulk of their time in Florida is more significant but is also not determinative. We have frequently indicated that a spouse may have a residence separate from that of his or her spouse or children. *Marsman* v. *Commissioner*, 205 F. 2d 335 (C.A. 4, 1953), affirming on this issue 18 T.C. 1 (1952); *Rudolf Jellinek*, 36 T.C. 826 (1961), acq. 1964–1 C.B. (Part 1) 4; *Frederick F. Hack*, 33 T.C. 1089 (1960), acq. 1960–2 C.B. 5; *David E. Rose*, 16 T.C. 232 (1951).

The facts of this case are closely analogous to those of *Hack*, where the taxpayer, a *United States citizen*, succceeded in sustaining his claim for exclusion of earned income under section 116 of the Internal Revenue Code of 1939 on the ground that he was a resident of Peru—a much more difficult position for the taxpayer since he was not aided

by a presumption of nonresidence and he was seeking an exemption from tax. Respondent seeks to distinguish *Hack* on the basis that the taxpayer never visited or rejoined his family during the period of their presence in the United States. There is no requirement of absolute geographic celibacy such as respondent suggests. Cf. *David E. Rose, supra.*

William's case would have been stronger had there been independent corroboration of his testimony as to the health and educational reasons for his family's move to Florida, such as medical evidence and evidence of the comparative merits of the Daytona Beach and Simcoe schools. Nevertheless, we are satisfied as to the bona fides of William's explanation.

Taken at face, William's sworn statements to the Federal and State authorities regarding his residence present greater difficulty. However, it has often been held that similar sworn statements, satisfactorily explained, are insufficient in and of themselves to denigrate a claim of residence. *Weible* v. *United States, supra; Rudolf Jellinek, supra; D. L. Phillipe,* 26 T.C. 984 (1956) ; see *Lyon Tyler Matthew,* 38 T.C. 417, 429, 441 (1962), reversed on another ground 335 F. 2d 231 (C.A. 5, 1964), certiorari denied 380 U.S. 943 (1965). We recognize, of course, that, although such statements may be discounted, they cannot be ignored. Nevertheless, William gave a plausible explanation regarding his execution of each of these documents: Application for U.S. immigrant visa [5] (so his children would be able to attend Florida public schools) ; Florida manifestation of domicile (same reason) ; Florida homestead exemption (to obtain local tax benefit) ;[6] Florida operator's license and registration of a car in his name.[7]

Admittedly, William's explanation of the sworn statements leaves some loose ends. However, the very weak "intended indefiniteness" to be drawn from such loose ends is insufficient to overcome the com-

---

[5] It should be noted that there was no requirement in September 1953 that a Canadian citizen temporarily visiting the United States obtain a visa. 22 C.F.R. sec. 41.6(a)(1)(1) (1957 supp.), promulgated July 3, 1953 (19 Fed. Reg. 4255). There is no direct evidence that William obtained reentry permits, a necessary prerequisite to keeping his right to permanent residence in the United States alive. But the reasonable inference to be drawn from the testimony is that he never obtained any reentry permit and therefore allowed his visa to lapse. Indeed, William testified that after his initial entry he never used his visa or, except for purposes of identification, his Canadian passport.

[6] Hazel was a cotenant by the entireties and, under the liberal construction given to the Florida statute, would appear herself to have been eligible for the exemption. Fla. Stat. Ann. secs. 192.12 and 192.13 ; *Judd* v. *Schooley,* 158 S. 2d 514 (Fla. Sup. Ct. 1963) ; *Bessemer Properties, Inc.* v. *Gamble,* 158 Fla. 38, 27 S. 2d 832 (1946). William's joinder might well be viewed as surplusage stemming from a desire to conform the signatures on the application to the ownership of record.

[7] A nonresident whose children are attending Florida schools is required to have a Florida operator's license and to register his car in the State. Fla. Stat. Ann. secs. 322.04(3), 322.04(5), 320.37, 320.38 ; 1942 Op. Atty. Gen. Fla. 388 ; 1949 Op. Atty. Gen. Fla. 358.

bination of the presumption [8] of nonresidence, sec. 1.871–4(b), Income Tax Regs., and the limited nature and extent of William's stays in Florida.

Similarly, William's intention always to return to Florida is not enough to negate the sporadic nature of his visits. Although intention carries great weight in determining whether a residence *once established* has been abandoned, see *Josette J. F. Verrier Friedman*, 37 T.C. 539, 556 (1961), it cannot itself establish residence where the intent is to return only as a sojourner or transient.

In our opinion, William's occasional and limited stays in Florida (amounting to approximately 70 days in each year) and his other activities in Florida did not cause the line between nonresidency and residency to be crossed. "Some *permanence of living* within borders is necessary to establish residence." (Emphasis added.) See *Joyce de la Begassiere*, 31 T.C. 1031, 1036 (1959), affirmed per curiam 272 F. 2d 709 (C.A. 5, 1959). It takes more than the use of a house as a closet for golfing and other sporting gear, or even sporadically to sleep and eat, to convert it into a home.[9] It may well be that William intended to make Florida his residence—perhaps as early as 1953—but his intent was never accompanied by the requisite physical presence. Both elements are necessary to establish residence. *Rudolf Jellinek*, *supra; Frederick F. Hack*, *supra*.

There is no question that prior to the years involved herein William's sole residence was in Canada for the better part of 30 years. He was married there, his children were born and raised there, the family menage was located there, he started and developed substantial business activities there, and he became part of the community in which he lived.[10] Simcoe was the center of gravity of his life. In 1953, certain underpinnings of this superstructure were removed. But William continued to spend the bulk of his time in Canada, his principal business activities continued to be centered there, he continued to live in the family residence in Simcoe (with domestic help) during his nonworking, nontraveling hours, and his clothing and personal belongings (with very minor exceptions) remained there.

Under all the facts and circumstances of this case and giving appropriate weight to the presumption of nonresidency contained in

---

[8] The effect of a presumption is unclear, and a leading authority on evidence notes that there are eight different views of its effect. 1 Morgan, Basic Problems of Evidence 34 (1961). In the instant situation we conclude that the presumption flowing from alienage has the effect of requiring the respondent to bear the burden of insuring that sufficient evidence is in the record to produce the status of a "wash" vis-a-vis the presumption. Uniform Rule of Evidence 14. The burden of persuasion, of course, still remains with the petitioner.

[9] Respondent singles out references in letters written by petitioner to the house in Daytona Beach as his "home." But there are numerous characterizations in the same letters of the house in Simcoe as "home."

[10] Cf. *Fuller* v. *Hofferbert*, 204 F. 2d 592 (C.A. 6, 1953) ; *Lois Kaiser Stierhout*, 24 T.C. 483 (1955) ; *David E. Rose*, 16. T.C. 232 (1951) ; *J. P. Schumacher*, 32 B.T.A. 1242 (1935).

respondent's regulations, we conclude that William was a nonresident alien of the United States during the taxable years before us within the meaning of section 872(a).

## II. *Hazel's Residence*

Hazel lived with the children in the Florida house for about 40 weeks each year while the children attended Florida schools. Hazel urges that this fact means that she had an intent to remain for a definite time—i.e., 40 weeks on each trip—and was therefore a "nonresident."

Such an argument strains credulity. To hold that the combination of physical presence and the permanence reflected by being a homeowner and a parent *present* in a community where her children were attending school and where she had a Florida licensed car and Florida bank and savings accounts did not constitute residence would emasculate the ordinary meaning of residence. Absent any countervailing evidence,[11] these circumstances require a finding that Hazel was assimilated into and became an integral part of the community, playing the same role as other mothers.

We conclude that Hazel was a resident of the United States for Federal income tax purposes during the years in question.[12]

There is some suggestion in petitioners' briefs that, even though Hazel is held to be a resident of the United States, she is not taxable on U.S.-source capital gain realized in the years in question because under Canadian law she was also a Canadian resident and such gain is therefore excluded by virtue of article VIII[13] of the Income Tax Convention and Protocol with Canada notwithstanding article XVII of the convention. Petitioners do not press this argument seriously and, indeed, it would appear that, even assuming Hazel was also a resident of Canada, she would nevertheless be taxable under article XVII of the convention,[14] which specifies that the benefits of the convention are not available to citizens or residents of the

---

[11] It is noteworthy that, unlike William, Hazel did not testify, nor was any explanation furnished to the Court as to why she did not take the stand.

[12] The term "resident" is not defined in the treaty. The criteria for determining "residence" appear to be the same under United States and Canadian law, thus obviating the problem of the choice of law for construing the term "resident of the United States." See *Georges Simenon*, 44 T.C. 820, 835 (1965); Harvard Law School, Taxation in the United States p. 1154 (1963); Joseph, "Income Tax Treaties—A Comparison of Basic Provisions," 12th Ann. N.Y.U. Tax Inst. 787, 790 (1954).

[13] "Gains derived in one of the contracting States from the sale or exchange of capital assets by a resident or a corporation or other entity of the other contracting State shall be exempt from taxation in the former State, provided such resident or corporation or other entity has no permanent establishment in the former State."

[14] "Notwithstanding any other provisions of this convention, the United States of America in determining the income and excess profits taxes, including all surtaxes, of its citizens or residents or corporations, may include in the basis upon which such taxes are imposed all items of income (other than income within the scope of par. 1(b) of Article VI) taxable under the revenue laws of the United States of America as though this convention had not come into effect."

United States. See Exec. Rept. No. 3, 77th Cong., 2d Sess., p. 4 (1942).[15]

We conclude that the treaty's purpose of preventing double taxation does not encompass exemption from tax of U.S.-source capital gain by a U.S. resident, notwithstanding that such individual may have a concurrent residence in Canada.[16]

### III. *Penalty on Hazel* [17]

The final issue is whether Hazel's failure to file a return in 1957 was due to reasonable cause so as to preclude the applicability of section 6651.

We recognize that Hazel was a citizen of a foreign country and that the question of her filing a return was largely rooted in the ultimate determination of her status as a resident or nonresident alien.[18] Even assuming that she is entitled to the benefit of every doubt and that she honestly believed she was exempt from tax, we nevertheless cannot hold on this barren record [19] that there was reasonable cause on her part. We hold that the penalty applies. Cf. *Robert A. Henningsen*, 26 T.C. 528, 536 (1956), affd. 243 F. 2d 954 (C.A. 4, 1957); *W. C. Johnston*, 24 T. C. 920 (1955); *Fraternal Order of Civitans of America*, 19 T.C. 240, 244 (1952); compare *Daisy M. Twinam*, 22 T.C. 83, 90 (1954).

*Decision will be entered under Rule 50.*

---

[15] "Under Article VIII * * * capital gains of a Canadian resident * * * are not subject to our income tax * * *. *This provision conforms to section 211* of the Internal Revenue Code [of 1939], *which exempts nonresident aliens* * * * from the capital gains tax." (Emphasis added.)

[16] Our recent decision in *Georges Simenon, supra* fn. 12, does not call for a different result. In *Simenon* we held that the taxpayer had not shown that he was a resident of France within the meaning of the French tax treaty. Thus, we did not reach the question of whether he would have been entitled to the benefits of the treaty if he had a dual residence.

[17] The penalty imposed by sec. 6651 for failure to file a return is based upon the deficiency in tax. Section 6651 (a) and (b). Since the deficiency asserted against William for 1957 is predicated solely on Canadian source income, it would appear that the finding of nonresident alien status as to him necessarily results in no deficiency in his tax for that year, so that the question of reasonable cause is academic.

[18] We note in passing that during 1957 Hazel was credited with $91.60 interest on a Daytona Beach savings account, which was subject to U.S. tax in the hands of a nonresident alien.

[19] There is no testimony aside from the residency question as to the reasons for the failure to file a return and on brief petitioners do not advert to the issue.