IAN W. MACLEAN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5178–77.    Filed March 12, 1980.

*William R. Bernard* and *Sharon A. Calegari de Armuelles*, for the petitioner.

*Carolyn M. Parr*, for the respondent.

### OPINION

WILBUR, *Judge:* Respondent determined a deficiency of $2,850.26 in petitioner's Federal income tax for the calendar year 1973. The issues for decision are (1) whether petitioner is entitled to use a taxable year other than a calendar year, and (2) whether $12,806.28 of income earned by petitioner in the United States during 1973 is exempt from U.S. tax under the provisions of the income tax treaty between the United States and the United Kingdom.

This case was fully stipulated and submitted for decision under Rule 122, Tax Court Rules of Practice and Procedure. The stipulation for trial, second stipulation for trial, and exhibits attached thereto are incorporated herein by reference.

Petitioner resided in the United Kingdom at the time he filed the petition in this case. Petitioner is and has been at all times a British subject.

Petitioner filed a Form 1040NR dated April 11, 1975, for the taxable year beginning August 17, 1973, and ending February 28, 1974, with the Service Center, Internal Revenue Service, Philadelphia, Pa.

By statutory notice of deficiency dated February 24, 1977, petitioner was advised of a deficiency in tax in the amount of $2,850.26 for the taxable year ended December 31, 1973. The deficiency was based on respondent's disallowance of petitioner's claimed exemption from U.S. income tax under article XI of the

United Kingdom-United States Income Tax Convention of April 16, 1945.

Prior to August 1973, petitioner was Business Development Executive for Plessey Electronics Division of the Plessey Co., Ltd. (hereinafter Plessey, Ltd.), in the United Kingdom, with special responsibilities for developing worldwide the company's postal automation business. During this period, petitioner was paid exclusively by Plessey, Ltd.

Prior to the year in issue, the Rohr-Plessey Corp. was formed by combining two divisions of Rohr Industries, Inc., and one division (sometimes referred to hereinafter as the Clark Division) of Plessey North America, Inc. Rohr-Plessey is a U.S. corporation, incorporated in the State of New York; Plessey North America, Inc., is a U.S. subsidiary of Plessey, Ltd. Rohr-Plessey was a joint venture company in which Plessey North America had initially a one-third share. This share was later reduced to 27½ percent, and was subsequently sold to Rohr Industries in late 1975.

By letter dated June 8, 1973, Paul G. Hendrickson (hereinafter Hendrickson), president of Rohr-Plessey, offered petitioner the position of vice president of the Clark Division of Rohr-Plessey. From August 1973 to August 1975, petitioner was "seconded" (loaned out) by Plessey, Ltd., to Rohr-Plessey for a 2-year period. Pursuant to this assignment, petitioner entered the United States on August 14, 1973, as a nonimmigrant intracompany transferee under an "L-1" visa.[1] He subsequently left the United States during the following periods:

Nov. 11–14, 1973 ................................... Visit to Canada
Dec. 23, 1973—Jan. 10, 1974 .................... Visit to U.K.
June 13–23, 1975 .................................. Visit to U.K.

Petitioner's association with Rohr-Plessey finished and he left the United States on August 18, 1975.

From August 1973 to November 1973, petitioner had an office at Rohr-Plessey in Clark, N.J., from which he supervised the previously arranged move of the Clark Division from New

---

[1]Admittance to the United States under an "L-1" visa may be granted to an alien who has been employed continuously for 1 year by a firm or corporation or an affiliate or subsidiary thereof and who seeks to enter the United States temporarily in order to continue to render his services to the same employer or to a subsidiary or affiliate thereof in a managerial or executive capacity or in a capacity which involves specialized knowledge. See sec. 101(a)(15)(L), Immigration and Nationality Act, Pub. L. 91–225, 84 Stat.116, 8 U.S.C. sec. 1101(a)(15)(L) (1970); 8 C.F.R. sec. 214.2(l) (rev. ed. 1979).

Jersey to Rockville, Md. During this period, petitioner occupied an apartment in East Orange, N.J. After the Clark Division's move to Maryland, petitioner had an office at Rohr-Plessey in Rockville. Petitioner stayed briefly in a Maryland motel while finding a suitable house for his family. On November 19, 1973, petitioner leased a four-bedroom townhouse in Rockville, Md., for 10 months beginning December 1, 1973. The initial lease period was subsequently extended until August 16, 1975.

Petitioner's family joined petitioner in the United States on January 10, 1974. The delay in their arrival in the United States was attributed to two reasons: petitioner's duties required him to occupy an apartment in New Jersey for a time; and the later arrival was thought to minimize the impact of the move on his children's education because it fit in with the end and beginning of school periods. The Rockville townhouse was the family's principal residence during their stay in the United States.

From August 1973 to August 1975, petitioner received his salary exclusively from Rohr-Plessey, which withheld Federal and State income taxes and social security taxes. In calendar year 1973, petitioner received from Rohr-Plessey salary payments of $12,806.28 plus group term life insurance whose cost was valued at $124.20. In calendar year 1974, petitioner was paid $39,218.52, including a bonus. Of this amount, petitioner attributed $5,691.68 to the period between January 1, 1974, and February 28, 1974. Using a fiscal tax year ending February 28, 1974, petitioner reported, on his Form 1040NR, wages of $18,497.96, all of which he excluded from gross income. Petitioner was not taxed in the United Kingdom on this income.

Rohr-Plessey deducted petitioner's wages on its U.S. corporate tax returns as a business expense.

Petitioner's salary at Rohr-Plessey was negotiated by the personnel director of Rohr Industries and by the personnel executive of the Plessey Telecommunications Overseas Division based at Liverpool, England. Petitioner was paid a salary a little above the midpoint of the range applying to Rohr-Plessey vice presidents, and accepted the Rohr-Plessey conditions of employment except for their pension scheme. To preserve his pension rights with Plessey, Ltd., petitioner was retained on the payroll of the Plessey Telecommunications Overseas Division at a "notional" (i.e., not taxable) salary for pension purposes equivalent to $18,075. Petitioner paid his own contribution to the

Plessey, Ltd., pension scheme and none to the Rohr-Plessey plan. The employer contribution to the Plessey, Ltd., scheme was shared by Plessey, Ltd., and Rohr-Plessey. At Rohr-Plessey, petitioner was treated as an employee for all but pension purposes.

Petitioner's title at Rohr-Plessey was vice president and division manager, Precision Machine Systems Division; his duties from August 1973 to August 1975 were to manage and supervise this division. Petitioner reported to Hendrickson who in turn reported to a board of directors of Rohr-Plessey which had representatives from Rohr Industries, Plessey North America, and Plessey, Ltd. Petitioner also reported to the management of Plessey North America and Plessey, Ltd., on the progress of the Plessey-contributed division and of Rohr-Plessey in general. Petitioner's immediate supervisor for day-to-day administration purposes was Hendrickson.

## Issue 1. Use of a Fiscal Taxable Year

The first issue concerns petitioner's taxable year. Petitioner asserts that, on the first income tax return he was required to file, he properly elected a fiscal year ending February 28, and therfore his income tax liability should be computed on that basis. Respondent contends that petitioner's annual accounting period for the taxable year in issue is a calendar year, and he determined the deficiency herein accordingly. Although neither party has addressed the matter, we note that the resolution of this issue may be dispositive of this case. If petitioner is correct in his assertion that he was entitled to report his income on the basis of a fiscal year ending February 28, 1974, then the calendar year 1973 was not a taxable year of this taxpayer, respondent erred in determining a deficiency for that period, and this Court can only hold in this proceeding that there is no deficiency for calendar year 1973, since there is no question before us of petitioner's liability for a fiscal year. *Linen Thread Co., Ltd. v. Commissioner*, 14 T.C. 725, 731 (1950); *Estate of Curtis v. Commissioner*, 36 B.T.A. 899, 903 (1937).

Section 441(a)[2] provides that taxable income shall be computed

[2]All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, unless otherwise stated.

on the basis of the taxpayer's taxable year. The term "taxable year" is defined by other subsections of section 441[3] to mean (1) the taxpayer's annual accounting period, i.e., the annual period on the basis of which the taxpayer regularly computes his income in keeping his books, if such period is a calendar year or fiscal year (secs. 441(b)(1), 441(c)); (2) the calendar year, if the taxpayer keeps no books, does not have an annual accounting period, or has an annual accounting period which does not qualify as a fiscal year (secs. 441(b)(2), 441(g)); and (3) the period for which a return is made if a return is made for a period of less than 12 months ( sec. 441(b)(3)).

Petitioner contends that his annual accounting period is the fiscal year ending February 28. Petitioner argues that (1) as a "new taxpayer," he was entitled to adopt a fiscal year without respondent's prior approval, pursuant to sec. 1.441-1(b)(3), Income Tax Regs.;[4] (2) that he properly elected a fiscal year on

---

[3]Sec. 441 provides in pertinent part as follows:

SEC. 441. PERIOD FOR COMPUTATION OF TAXABLE INCOME.

(a) COMPUTATION OF TAXABLE INCOME.—Taxable income shall be computed on the basis of the taxpayer's taxable year.

(b) TAXABLE YEAR.—For purposes of this subtitle, the term "taxable year" means—

    (1) the taxpayer's annual accounting period, if it is a calendar year or a fiscal year;

    (2) the calendar year, if subsection (g) applies; or

    (3) the period for which the return is made, if a return is made for a period of less than 12 months.

(c) ANNUAL ACCOUNTING PERIOD.—For purposes of this subtitle, the term "annual accounting period" means the annual period on the basis of which the taxpayer regularly computes his income in keeping his books.

(d) CALENDAR YEAR.—For purposes of this subtitle, the term "calendar year" means a period of 12 months ending on December 31.

(e) FISCAL YEAR.—For purposes of this subtitle, the term "fiscal year" means a period of 12 months ending on the last day of any month other than December. In the case of any taxpayer who has made the election provided by subsection (f), the term means the annual period (varying from 52 to 53 weeks) so elected.

    \*      \*      \*      \*      \*      \*      \*

(g) NO BOOKS KEPT; NO ACCOUNTING PERIOD.—Except as provided in section 443 (relating to returns for periods of less than 12 months), the taxpayer's taxable year shall be the calendar year if—

    (1) the taxpayer keeps no books;

    (2) the taxpayer does not have an annual accounting period; or

    (3) the taxpayer has an annual accounting period, but such period does not qualify as a fiscal year.

[4]Sec. 1.441-1 Period for computation of taxable income.

(b) *Taxable year.* \* \* \*

    \*      \*      \*      \*      \*      \*      \*

(3) A new taxpayer in his first return may adopt any taxable year which meets the requirements of section 441 and this section without obtaining prior approval. The first taxable year of a new taxpayer must be adopted on or before the time prescribed by law (not including extensions) for the filing of the return for such taxable year. \* \* \*

the first tax return he filed after his arrival in the United States in August 1973; (3) that the tax returns he filed for fiscal years ending February 28, 1974, 1975, and 1976 clearly reflected the income he received in each fiscal year; and (4) that he maintained books and records which definitively place his income and expenses within a fiscal year ending February 28.

Respondent controverts each of petitioner's arguments and contends that petitioner has maintained no books and records which would establish a fiscal year annual accounting period.

We find it unnecessary to resolve the first three arguments raised by petitioner because even if petitioner is correct in his assertions that he was entitled to, and properly attempted to, elect a fiscal year as his taxable year on his first U.S. tax return, he has failed to prove that he definitely established such an annual accounting period by means of books and records kept upon such basis. See *Freudmann v. Commissioner*, 10 T.C. 775 (1948).

Petitioner states on brief that he has complete records which definitively place his income and expenses within the fiscal year elected ending February 1974. However, with the exception of a copy of the tax return filed for the 1973–74 fiscal year, petitioner has failed to introduce any such records into evidence. Section 441(g) provides that if the taxpayer keeps no books or has no annual accounting period, his taxable year shall be the calendar year. Section 1.441–1(e)(2), Income Tax Regs., provides: "A fiscal year will be recognized only if it is established as the annual accounting period of the taxpayer and only if the books of the taxpayer are kept in accordance with such fiscal year."

Petitioner has not shown that he kept books and records as required by section 441 and, therefore, he did not have a right to report his income on the basis of a fiscal year ending February 28. Cf. *Brooks v. Commissioner*, 6 T.C. 504 (1946); *Stryker v. Commissioner*, 36 B.T.A. 326 (1937).

## Issue 2. Treaty Exemption

The second issue is whether the compensation petitioner received from Rohr-Plessey during the period in question is exempt from U.S. tax under the provisions of the income tax convention between the United States and the United Kingdom, April 16, 1945, 60 Stat. 1377, T.I.A.S. No. 1546, as modified by

supplemental protocol, June 6, 1946, 60 Stat. 1389 (hereinafter the treaty), and section 894(a).[5] To qualify for the treaty exemption, petitioner must prove: (1) That he was a resident of the United Kingdom for treaty purposes; (2) that he was present within the United States for not more than 183 days during the taxable year; and (3) that he received compensation for personal services performed during the taxable year within the United States for or on behalf of a person resident in the United Kingdom.[6] It is undisputed that petitioner was not prsesent in the United States for more than 183 days during either calendar year 1973 or during the period from August 14, 1973, through February 28, 1974. However, respondent contends that petitioner fails to meet either of the other two elements requisite to the treaty exemption. We agree.

Respondent argues that petitioner was not a resident of the United Kingdom for treaty purposes when he performed the services and received the compensation in issue, but was a resident alien of the United States and therefore does not qualify for the treaty exemption. The treaty[7] defines a "resident of the United Kingdom" as an individual "resident in the United Kingdom for purposes of United Kingdom tax and not resident in the United States for purposes of the United States tax." Petitioner fails both tests.

---

[5]SEC. 894. INCOME AFFECTED BY TREATY.

(a) INCOME EXEMPT UNDER TREATY.—Income of any kind, to the extent required by any treaty obligation of the United States, shall not be included in gross income and shall be exempt from taxation under this subtitle.

[6]Art. XI of the income tax convention between the United States and the United Kingdom, Apr. 16, 1945, 60 Stat. 1377, T.I.A.S. No. 1546, as modified by supplemental protocol, June 6, 1946, 60 Stat. 1389 (hereinafter the treaty), provides:

ARTICLE XI

(1) An individual who is a resident of the United Kingdom shall be exempt from United States tax upon compensation for personal (including professional) services performed during the taxable year within the United States if (a) he is present within the United States for a period or periods not exceeding in the aggregate 183 days during such taxable year, and (b) such services are performed for or on behalf of a person resident in the United Kingdom.

[7]Art. II of the treaty provides:

ARTICLE II

(1) In the present Convention, unless the context otherwise requires:

   *      *      *      *      *      *      *

(g) The term "resident of the United Kingdom" means any person (other than a citizen of the United States or a United States corporation) who is resident in the United Kingdom for the purposes of United Kingdom tax and not resident in the United States for the purposes of United States tax. A corporation is to be regarded as resident in the United Kingdom if its business is managed and controlled in the United Kingdom.

There is no evidence in the record establishing that petitioner was a resident of the United Kingdom for purposes of U.K. tax. The parties have stipulated that petitioner was not taxed in the United Kingdom on the $18,497.96 in wages which petitioner reported on his Form 1040 NR as having been received from Rohr-Plessey between August 1973 and February 28, 1974. Petitioner asserts on brief that he was "clearly considered a resident of the United Kingdom for tax purposes throughout the period of his secondment in the United States, under the well known remittance basis of taxation." Unfortunately, petitioner did not support this assertion with citations to any United Kingdom statutory or case law authority.[8] In the absence of any evidence regarding petitioner's tax status in the United Kingdom, we must conclude that petitioner was not subject to U.K. income tax on the compensation in issue. See *Budhwani v. Commissioner*, 70 T.C. 287 (1978).

Furthermore, even if petitioner was a resident of the United Kingdom for purposes of U.K. income taxes, he was not a "resident of the United Kingdom" for treaty purposes because he was "resident in the United States for the purposes of United States tax"[9] after August 14, 1973.[10] The term "residence" is not

[8]Our independent research has revealed that while "residence" is one factor in the imposition of tax under U.K. law, similar to U.S. tax law, there is no statutory definition of the term. Each case is considered on its facts, and the determination of U.K. residence must be made for each relevant year of assessment. Among the principal factors taken into account in determining residence for an individual taxpayer are (1) the time he is physically present in the United Kingdom during the year in question (under sec. 51, Income and Corporation Taxes Act, 1970, ch. 10 [hereinafter ICTA 1970], an individual who is physically present in the United Kingdom for a period aggregating 6 months during a period of assessment is considered to be a U.K. resident for that year); (2) residence in the United Kingdom in the previous year of assessment (under sec. 49, ICTA 1970, a British citizen whose "ordinary residence" has been in the United Kingdom is presumed to continue to be a U.K. resident even though he departs for the purpose of an occasional residence abroad); (3) the regularity of visits to the United Kingdom in successive years and the reasons for these visits; and (4) maintenance of a place of abode in the United Kingdom in the year in question (see *Peel v. Commissioners of Inland Revenue*, 13 Tax Cases 443 (1927)). See generally Harvard Law School, World Tax Service, "Taxation in the United Kingdom," 5/1.2 (1957); E. Gomeche, 68–6th Tax Management (BNA), "Business Operations in the United Kingdom," A–12, A–13.

[9]A determination that an individual is a resident of a foreign country is not dispositive of whether he is a resident of the United States for U.S. tax purposes. Abandonment of a foreign residence is not a necessary prerequisite to a finding of U.S. residence, nor does a finding of U.S. residence require the conclusion that the individual's foreign residence terminated. *Adams v. Commissioner*, 46 T.C. 352, 358 (1966).

[10]Stipulation 11 submitted by the parties states that "Petitioner was a non-resident alien before August 1973, and a resident alien from August 1973 to August 1975." Under Rule 91, Tax Court Rules of Practice and Procedure, in general, a stipulation is treated as a conclusive admission by the parties of the matter stipulated, regardless of whether it involves fact or the application of law to fact. Nevertheless, petitioner argues that justice requires the Court to permit him to strike stipulation 11 because the other stipulations collectively contradict it. Petitioner also asserts, on reply brief, that he

defined by the Internal Revenue Code. A person may acquire a residence for United States tax purposes even though he does not intend to reside there permanently and has a domicile elsewhere. See *Budhwani v. Commissioner, supra* at 290–291, and cases cited therein. The question of residence is factual and must be resolved in light of all of the facts and circumstances. *Escobar v. Commissioner,* 68 T.C. 304, 310 (1977).

The relevant guidelines for determining the residence of alien individuals are found in section 1.871–2, Income Tax Regs., which provides, in part:

(b) *Residence defined.* An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but, if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances.

In addition to the tests contained in section 1.871–2(b), section 1.871–4, Income Tax Regs., establishes a rebuttable presumption concerning the nonresidency of an alien, as follows:

(a) *Rules of evidence.* The following rules of evidence shall govern in determining whether or not an alien within the United States has acquired residence therein for purposes of the income tax.

(b) *Nonresidence presumed.* An alien, by reason of his alienage, is presumed to be a nonresident alien.

(c) *Presumption rebutted.—* * * *

\* \* \* \* \* \* \*

---

never conceded that he was a resident of the United States *for tax purposes.* Rather, he describes stipulation 11 as simply an expression of the fact that he lived in the United States for a period of time. We are not terribly sympathetic to petitioner's interpretation of language that seems plain enough. Nevertheless, we have examined the question of petitioner's residency on the basis of all of the evidence without giving any weight to the inartful wording and potential ambiguity of stipulation 11. In this connection, however, we note that respondent's case has not been unduly hampered because the evidence as a whole requires us to reach the same conclusion.

(2) *Other aliens.* In the case of other aliens, the presumption as to the alien's nonresidence may be overcome by proof—

(i) That the alien has filed a declaration of his intention to become a citizen of the United States under the naturalization laws; or

(ii) That the alien has filed Form 1078 or its equivalent; or

(iii) Of acts and statements of the alien showing a definite intention to acquire residence in the United States or showing that his stay in the United States has been of such an extended nature as to constitute him a resident.

Applying these standards to the facts before us, we conclude that petitioner was a resident of the United States for income tax purposes beginning in August 1973. In reaching this conclusion, we have considered all of the facts in the record as well as the presumption set forth in the regulations.

Petitioner entered this country in August 1973 to turn the Clark Division around from a loss operation into a profitable operation. This objective could, in our opinion, be accomplished only by petitioner's presence in this country for an extended period of time. Indeed, a letter to petitioner from the overseas manpower manager of Plessey, Ltd., confirming petitioner's secondment to Rohr-Plessey, indicates that while the contemplated period of petitioner's tour of duty in the United States was 2 years, the length of the tour might be extended.[11] Moreover, petitioner's stay in this country was not limited to a definite period of time by his "L–1" visa. Such visas are usually granted for a period of 1 year, although they are subject to yearly extensions in increments up to 1 year, as required to continue temporary employment previously authorized by the appropriate Immigration and Naturalization Service (hereinafter INS) official.[12] We note in this connection that a letter from Hendrickson to INS which accompanied the visa petition filed by Rohr-Plessey on petitioner's behalf states that Rohr-Plessey wished to appoint petitioner as a vice president of the corporation for a period of up to 36 months. Thus, petitioner could expect to be allowed to extend his stay beyond the initial 1-year visa period

---

[11]A draft letter of appointment dated July 6, 1973, from J. W. Benson, overseas manpower manager, to petitioner, describes the conditions of petitioner's secondment, in part, as follows:

*"Tour of Duty*

"(a) Your tour of duty will be for a maximum period of two years in the USA from the date of your arrival in that country. *Any alteration to the length of this tour will be fully discussed before changes are made.* [Emphasis added.]"

[12]See 8 C.F.R. sec. 214.2(*l*)(3) (rev. ed. 1979).

according to the requirements of his employment at Rohr-Plessey.

Petitioner also argues that since his family and personal effects were not brought to the United States until January 10, 1974, he "simply could not have been a resident alien prior to that date." This argument is without merit. The location of an alien's family is only one factor considered in determining an individual's residence.[13] *Adams v. Commissioner*, 46 T.C. 352 (1966); *Baehre v. Commissioner*, 15 T.C. 236 (1950); *Schumacher v. Commissioner*, 32 B.T.A. 1242 (1935). The arrival date of petitoner's family was chosen to minimize the disruption in the children's educations and to avoid the necessity of moving the household twice within a few months. Moreover, the documents explaining the conditions of petitoner's employment at Rohr-Plessey show that petitioner intended from the outset to be joined here by his family.[14] Under the circumstances of *this* case, the fact that petitioner's family did not come to the United States until 1974 does not establish that petitioner was not a U.S. resident during 1973.

We recognize that under section 1.871–4(b), Income Tax Regs., petitioner is presumed to have been a nonresident. However, we find that the record as a whole indicates a definite intention to acquire residence in the United States which, under section 1.871–4(c)(2)(iii), Income Tax Regs., is sufficient to overcome the presumption of nonresidence. Cf. *Budhwani v. Commissioner*, 70 T.C. 287, 292 n. 6 (1978).

However, even assuming petitioner was a nonresident alien, resident in the United Kingdom after August 1973, he would still fail to qualify for the treaty exemption. One requirement for the treaty exemption from U.S. taxation of compensation for personal services is that the services are performed "for or on behalf of a person resident in the United Kingdom." The compensation paid to petitioner by Rohr-Plessey between August 1973 and August 1975 was not for such services.

---

[13]In *Craig v. Commissioner*, 73 T.C. 1034 (1980), we held that a Swiss resident who traveled to the United States to find new employment retained his Swiss residence until he severed his community ties there and brought his family to the United States. In such a case, it is appropriate to allow a reasonable time to terminate the former residence. Petitioner, however, had his new employment arranged prior to leaving his former residence. Therefore, the decision to leave his wife and children behind temporarily for personal reasons was one purely of family convenience.

[14]Provisions were made for company-paid round trip air travel between the United Kingdom to the United States for petitioner, petitioner's wife, and their children.

Petitioner asserts that his case fits within the holding of Rev. Rul. 70–247, 1970–1 C.B. 156, and therefore, the compensation he received during his secondment qualifies for the treaty exemption. Rev. Rul. 70–247 holds that an individual employed by a foreign corporation managed and controlled in the United Kingdom is exempt under article XI of the treaty from U.S. income taxation on compensation received from that corporation for personal services rendered in the United States if he is present in the United States for not more than 183 days during the taxable year, even though the foreign corporation has a permanent establishment in the United States. The question addressed in the ruling concerns the residence of the employer-corporation, i.e., the effect of the employer's having a permanent establishment in the United States on the employee's qualification for the treaty exemption. In this case, the residence of Plessey, Ltd., is not in dispute. The issue is whether Plessey, Ltd., was the entity "for or on behalf of" which petitioner performed the services for which he was compensated between August 14, 1973, and August 17, 1975. Rev. Rul. 70–247 is not pertinent to our inquiry.

Petitioner argues that Plessey, Ltd., concededly a "resident of the United Kingdom" within the meaning of the treaty, was his employer during the period of his secondment to Rohr-Plessey and therefore, he satisfies the treaty exemption requirement. Petitioner focuses on the following indicia of continuing employment as support for this position: during the period of his secondment, petitioner retained all seniority and continuity benefits with Plessey, Ltd.; petitioner made routine reports to Plessey, Ltd., regarding the progress of the Clark Division; Plessey, Ltd., reserved the right to cancel at any time the remainder of petitioner's secondment; petitioner researched Canadian expansion opportunities for Plessey, Ltd.

Respondent contests the accuracy of some of these items. However, even assuming, arguendo, the continuation of an employer-employee relationship between Plessey, Ltd., and the petitioner during his secondment to Rohr-Plessey, this does not establish that the compensation petitioner received was for services performed as an employee of Plessey, Ltd. On the contrary, the record as a whole clearly indicates that the compensation petitioner was paid by Rohr-Plessey was received for services he performed directly for that company.

Petitioner described the service he performed for Plessey, Ltd., in general terms, as converting a former division which was loss making in 1973 into a profitable division with a substantial backlog of work. Petitioner described the services he claimed to be performing on behalf of Plessey, Ltd., more specifically in response to respondent's interrogatories, as follows:

Q. What services do you claim you were performing on behalf of the Plessey Co., Ltd. during 1974?

A. During 1974, I supervised the Plessey contributed division to Rohr-Plessey, building up the back-log of work, expanding the workforce and generally working towards profitable operation. I also contributed significantly to the Corporate Strategy of Rohr-Plessey in formulating plans for product and market diversification. I helped to ensure that the Plessey members of the joint Board approved the new plans. These plans were later successfully implemented to the benefit of both Rohr and Plessey.

The parties have stipulated that from August 1973 to August 1975, petitioner's basic job specifications and duties remained the same. This description reflects a commitment of petitioner's time and talents directly to the operations of Rohr-Plessey, rather than to Plessey, Ltd. Furthermore, throughout the period of his secondment, petitioner was treated as an employee of Rohr-Plessey for all but pension purposes. Petitioner received a salary and certain fringe benefits[15] paid by Rohr-Plessey commensurate with other Rohr-Plessey vice presidents. His immediate supervisor for day-to-day administrative purposes was the president of Rohr-Plessey. Petitioner himself supervised the work of and was reported to directly by five middle-level executives of Rohr-Plessey. Based on the evidence presented, we conclude that the services for which petitioner was compensated were directed to the profitable operation of Rohr-Plessey and were performed for the primary benefit of that corporation; any benefit obtained by Plessey, Ltd., was purely the incidental result of its being a shareholder in the U.S. corporation.

Petitioner also argues that the services he rendered during his secondment were "for or on behalf of a resident of the United Kingdom" because the benefits of his services accrued to Plessey, Ltd., as a one-third shareholder in Rohr-Plessey and as the contributor of the Clark Division. It is well established that a

---

[15]Petitioner's annual leave, medical expenses, company car, bonuses, and business expenses were covered by Rohr-Plessey in line with Rohr-Plessey's normal remuneration policy for vice presidents.

corporation and its shareholders are separate entities and the business of a corporation is separate from that of its shareholders. See *New Colonial Ice Co. v. Helvering,* 292 U.S. 435 (1934); *Burnet v. Clark,* 287 U.S. 410 (1932). There has been no contention that the business losses of the Clark Division impacted upon Plessey, Ltd.'s own operations or that Rohr-Plessey and Plessey, Ltd., were in any manner functionally related. Whatever benefit may have accrued to Plessey, Ltd., from petitioner's services to Rohr-Plessey was only the indirect benefit common to any shareholder whose investment position is improved when an ameliorative change in corporate management occurs. We believe that such an indirect benefit is insufficient to satisfy the treaty requirement.

*Decision will be entered for the respondent.*